75 A.3d 1168

BRUCE KAYE, INDIVIDUALLY AND AS TRUSTEE OF THE BRUCE KAYE REVOCABLE TRUST AND THE BRUCE KAYE DYNASTY TRUST, JASON KAYE, FLAGSHIP RESORT DEVELOPMENT CORPORATION, FIRST RESORTS MANAGEMENT COMPANY, INC., ATLANTIC PALACE DEVELOPMENT, LLC, AND LA SAMMANA VENTURES, LLC, PLAINTIFFS–RESPONDENTS/CROSS–APPELLANTS, v. ALAN P. ROSEFIELDE, PLUMROSE COMPANY, INC., AND ROSE ASSOCIATES, INC. OF MIAMI, DEFENDANTS/THIRD–PARTY PLAINTIFFS–APPELLANTS/CROSS–RESPONDENTS, AND LA SAMMANA MANAGEMENT, LLC, AND BA MANAGEMENT, LLC DEFENDANTS, v. DEBORAH KAYE AND 2000 BRUCE KAYE DYNASTY TRUST, THIRD–PARTY DEFENDANTS, AND HOWARD ALTER, SUSAN TUNNEY, MICHAEL VALENTI, RONNIE STRANSKY, KENNETH WOLFE, AND DENNIS RICHARD, THIRD–PARTY DEFENDANTS/RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 2, 2011—Decided August 16, 2013.

 

 

 

424

428

Before Judges FUENTES, GRAVES, and HARRIS.

*Steven J. Fram* argued the cause for appellants/cross-respondents (*Archer & Greiner,* and *Marshall, Dennehey, Warner, Coleman & Goggin,* attorneys; *Mr. Fram* and *John L. Simm,* of counsel; *Mr. Fram, John C. Connell,* and *Benjamin D. Morgan,* on the brief).

*Edwin J. Jacobs, Jr.*, argued the cause for respondents/cross-appellants (*Jacobs & Barbone*, attorneys; *Mr. Jacobs, Louis M. Barbone*, and *Stephen F. Funk*, on the brief).

*Zucker Steinberg Sonstein & Wixted, P.C.*, attorneys for respondents *Susan Tunney, Howard Alter, Ronnie Stransky*, and *Michael Valenti*, join in the brief of respondent/cross-appellant, Bruce Kaye.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

This case has been besieged by an inordinate amount of complications, some inherent to the issues raised by the parties, others created by a series of unfortunate and misguided decisions of the first judge who presided over the case. We are compelled to address some of the root causes of these problems to adequately review and resolve the legal issues raised by the parties in this appeal. While going about this task, we are mindful to prevent matters extraneous to the appellate process from interfering with our overriding responsibility to provide the parties in this controversy what they are entitled to receive from us: a fair and impartial application of the law to the factual record developed before the trial court.

Although technically there are a number of parties named as litigants in this case, distilled to its essence, this is a civil dispute between two main actors, plaintiff Bruce Kaye and defendant Alan Rosefielde. These two men once enjoyed each other's company and respected each other's business acumen. Their professional association appeared mutually beneficial at its inception and held great promise for continued prosperity. Since matters went awry, however, Kaye and Rosefielde have pursued their respective claims against each other with the same passion and zeal that once characterized their success in business. With these observations as prologue, we will now identify the other parties in the case.

In addition to Kaye, plaintiffs include: La Sammana Ventures, LLC (La Sammana); First Resorts Management Company, Inc.; Flagship Resort Development, Corp. (Flagship); Atlantic Palace Development, LLC (Atlantic Palace); two trusts created by Kaye, the Bruce Kaye Irrevocable Trust and the Bruce Kaye Dynasty Trust; and Kaye's son, Jason Kaye (Jason).[1] In addition to Rosefielde, defendants include: two companies under his owner-ship and control, Plumrose Company, Inc. (Plumrose), and Rose Associates, Inc. (Rose Associates); and two other companies that he co-owned with entities or individuals that were associated with Kaye, La Sammana Management, LLC, and BA Management, LLC (BA Management).[2]

Rosefielde had an employment relationship with Flagship, At-lantic Palace, and La Sammana, three entities that sold timeshares to consumers. Kaye hired Rosefielde to be the chief operating officer (COO) of Flagship. Rosefielde also assisted Kaye in managing Atlantic Palace and its related companies. Although the parties disagree as to when Rosefielde assumed the role of general counsel, it is not disputed that, at some point prior to 2005, Rosefielde assumed this role with respect to all of the entities that Kaye had an ownership interest in.

In 2005, plaintiffs filed a complaint in the Atlantic County Chancery Division, alleging that Rosefielde breached his fiduciary responsibility to plaintiffs "[d]uring his tenure as General Coun-sel," was an unfaithful servant, committed civil fraud, illegally practiced law in New Jersey, and committed legal malpractice through a series of unethical machinations and fraudulent transac-tions. Plaintiffs alleged that Rosefielde committed these civil

---

[1] In the interest of clarity, we will adhere to the appellations used by the second trial judge and will refer to Bruce Kaye as "Kaye" and to Jason Kaye as "Jason." No disrespect is intended or implied to either man.

[2] La Sammana Management, LLC, and BA Management did not participate as individual parties at trial and were not individually represented by counsel.

wrongs to conceal his unethical, illegal schemes and to improperly enrich himself at plaintiffs' expense.[3]

Rosefielde filed a responsive pleading, denying all wrongdoing, and a counterclaim, alleging that he was terminated from his employment as Flagship's COO in violation of an oral contract and in retaliation for objecting to what he reasonably believed were criminal and unethical activities engaged in or directed by Kaye to defraud the Federal Trade Commission and bribe Atlantic City officials. Rosefielde also grounded his counterclaim on the protections afforded to whistleblowers in the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. Rosefielde demanded a jury trial in his responsive pleading to Kaye's complaint and reiterated the demand for a jury trial in his counterclaim, which raised independent affirmative claims for relief. Kaye also demanded a jury trial in his answer to Rosefielde's counterclaim.

I

This case was first assigned for case management and, if necessary, trial to Judge Steven P. Perskie.[4] For reasons explained in detail by the Supreme Court in *In re Perskie*, 207 *N.J.* 275, 24 *A.*3d 277 (2011), the case was transferred in October 2006 from Judge Perskie and reassigned to Judge William E. Nugent. 207 *N.J.* at 281–84, 24 *A.*3d 277. After an eight-week bench trial, Judge Nugent decided the case primarily in plaintiffs' favor. Although Judge Nugent denied plaintiffs' application to compel Rosefielde to disgorge his salary, Judge Nugent rescinded Rosefielde's interests in three Kaye entities, awarded plaintiffs com-

---

[3] Just over a year after filing their original complaint, plaintiffs filed a first amended complaint, adding a seventh count alleging breach of fiduciary duty, fraud, and unfaithful servant. Six months later, plaintiffs filed a second amended complaint, which provided additional allegations to support this count.

[4] Judge Perskie retired from the judiciary on February 1, 2010.

pensatory damages, punitive damages, and counsel fees, and dismissed Rosefielde's counterclaim.

On appeal, defendants assert that: (1) Judge Nugent erred in finding that Rosefielde violated certain sections of the Rules of Professional Conduct governing the practice of law in this State, specifically with respect to the La Sammana entities; (2) Rosefielde was entitled to indemnification; (3) the punitive damages award was unwarranted; (4) the facts did not establish that Rosefielde breached any fiduciary duty; (5) plaintiffs' "fraudulent deed" claims should have been barred pursuant to the entire controversy doctrine; (6) the decision in plaintiffs' favor improperly relied on inadmissible evidence; (7) the trial court improperly denied Rosefielde's right to a jury trial on his CEPA and breach of contract claims; and (8) the integrity of the trial was compromised by Judge Perskie's recusal and subsequent appearances at the proceedings before Judge Nugent. Defendants seek a complete and total reversal of the outcome of the bench trial conducted by Judge Nugent, and request that the case be remanded to a different venue to allow Rosefielde's claims that are entitled to be decided by a jury to be tried separately from the claims that assert purely equitable relief.

On cross-appeal, plaintiffs contend that the trial court erred in not ordering disgorgement of Rosefielde's salary based on his breach of fiduciary duty and disloyalty to Kaye and his business entities. Plaintiffs also seek disgorgement of Rosefielde's salary as general counsel (a/k/a in-house counsel [5]), because he did not adhere to the ethical rules and procedural safeguards established by the Supreme Court to regulate this particular aspect of the legal profession and was not otherwise authorized to practice law in this State. Finally, plaintiffs argue that the trial court should have compelled defendants to reimburse three of the individuals who were deposed by Rosefielde in connection with this case for their out-of-pocket expenses and consequential loss of pay.

---

[5] *See Rule* 1:27–2(a).

After carefully reviewing the massive record [6] developed by the parties before the trial court, we affirm, in part, reverse in part, and remand for further proceedings.

As a threshold issue, we affirm Judge Nugent's invocation and application of the doctrine of ancillary jurisdiction to deny Rosefielde's motion to enforce his demand for a jury trial on his breach of contract and CEPA claims, which were asserted in his counterclaim. Although, under Article I, paragraph 9 of the New Jersey Constitution, a legal action alleging a breach of contract is ordinarily tried before a jury, and notwithstanding the legislative language that "[u]pon the application of any party, a jury trial shall be directed to try the validity of any claim under" CEPA, *N.J.S.A.* 34:19–5, we are satisfied that Judge Nugent correctly construed the Supreme Court's holding in *Lyn–Anna Properties v. Harborview Development Corp.,* 145 *N.J.* 313, 678 *A.*2d 683 (1996), and properly exercised his discretionary authority to adjudicate the counts in Rosefielde's counterclaim that sought purely legal relief in the form of compensatory damages.

With this holding as backdrop, we affirm Judge Nugent's decision to rescind Rosefielde's ownership interests in La Sammana, La Sammana Management, and BA Management, three business entities principally owned by Kaye, as well as the compensatory damages awarded to Kaye in connection with these transactions. With respect to plaintiffs' claims of legal malpractice and civil fraud, there is sufficient competent evidence in the record to support Judge Nugent's findings that Rosefielde violated his ethical and professional responsibilities to plaintiffs, both in his capacity as in-house general counsel of Kaye's business entities and in his role as Kaye's personal attorney.

---

[6] The record includes: sixty-five volumes of transcripts, covering approximately 7000 pages of witness testimony and arguments of counsel at various hearings; eight volumes of appellants' appendices, consisting of 2939 documents and exhibits; and two volumes of respondents' appendices, consisting of 383 pages of additional documents.

We vacate, however, Judge Nugent's award of counsel fees to plaintiffs based on Rosefielde having committed professional malpractice and fraud. The record before us shows that plaintiffs were unable to prove that Rosefielde's legal malpractice and fraudulent conduct proximately caused any compensable damages to them. We thus remand for the trial court to reconsider and, if necessary, recalculate the amount of counsel fees, if any, that plaintiffs are entitled to receive under the circumstances presented.

We also vacate the trial court's award of punitive damages based on Rosefielde's fraudulent acquisition of an ownership interest in BA Management and his use of corporate funds to pay for a personal trip to Las Vegas, Nevada. With respect to BA Management, the record before us does not show that Rosefielde's fraudulent scheme to acquire an ownership interest in this company proximately caused any compensable damages to Kaye. We thus remand for the trial court to reconsider whether an award of punitive damages is sustainable based only on the compensatory damages correctly awarded for Rosefielde's improper use of corporate funds to pay for his personal trip to Las Vegas.

We now turn to the arguments raised by plaintiffs in their cross-appeal. We affirm Judge Nugent's decision to deny plaintiffs the remedy of disgorgement and forfeiture. Judge Nugent's factual findings on these two issues are supported by the record, and his legal analysis denying this relief is unassailable.

Before we begin our recitation of the relevant facts, we are compelled to dispel any aspersions that might be inferred by our departure from the Appellate Division's long-held practice of not identifying a trial judge by name in those opinions where we disagree with any part of a judge's ruling or decision. This practice, grounded on our great respect for the hard work performed by our fellow jurists who are faced with enormous pressure on a daily basis to make extremely complex decisions in the most expeditious way possible, has been rendered inapplicable here for two basic reasons. First, as previously noted, the names

of the jurists involved in this case have already been publicly discussed by our Supreme Court in *In re Perskie, supra,* a published opinion. Second, this case has received a great deal of public attention, in both the traditional media and in our State's legal periodical of record, the New Jersey Law Journal. To ignore these facts would not only be futile, but it may be misconstrued by some as hypocritical.

As noted earlier, Judge Perskie ultimately recused himself from presiding over this trial. As the Supreme Court found, his decision thereafter to appear on two separate occasions as a spectator at the trial that Judge Nugent presided over and to approach and speak with one of Kaye's attorneys during his second visit to Judge Nugent's courtroom was "ill-considered" and in violation of *Canons* 1, 2A, and 3B of the *Code of Judicial Conduct. In re Perskie, supra,* 207 *N.J.* at 284, 24 *A.*3d 277. Defendants argue that Judge Perskie's undisputed transgressions tainted the impartiality of the proceedings before Judge Nugent. We disagree. Based on this record, we are satisfied that Judge Nugent's role as fact-finder and legal arbiter was not compromised in any way by Judge Perskie's conduct. Although we have disagreed with some of the legal rulings he made in this case, Judge Nugent's integrity as a jurist is beyond reproach.

## II

Rosefielde graduated from law school in 1969 and was not admitted to practice law in New York until 1974. During this five-year hiatus, he worked as a tax advisor and planner in the tax department of a national accounting firm. In 1971, he and an attorney named Arnold Gitmore [7] started an accounting and tax planning business called "Executive Tax Planning." When Rosefielde was finally admitted to practice law in New York in 1974, he

---

[7] Although the record is not clear, we presume that Gitmore was admitted to practice law at the time.

and Gitmore opened a new firm dedicated to entertainment law called "Rosefielde and Gitmore." Rosefielde has never been admitted to practice law in New Jersey.

Rosefielde testified that, during the 1970s, he and Gitmore represented a number of well-known entertainers and artists such as Bette Midler, Rod Stewart, Andrew Lloyd Weber, and the Bee Gees; they also represented music companies such as Motown Records. Rosefielde made this impressive client list known to Kaye when the two men first met in 1997. Rosefielde told Kaye he was a tax attorney, a business person, and an investor.

Kaye has enjoyed great success in business despite having had limited formal education. By his own admission, he has a ninth grade education. Shortly after their first meeting, Rosefielde began giving Kaye tax and management-consulting advice concerning Kaye's companies. For the first four or five years, Kaye paid Rosefielde on an hourly basis for his legal work and for work related to matters involving federal and state taxes. Rosefielde resided in Florida at the time.

In 2002, Kaye noted a decline in revenues from his businesses in Atlantic City. He asked Rosefielde to come to Atlantic City to work with him for a few months to improve the operations of his businesses. From September until December 2002, Rosefielde worked out of Kaye's office in Atlantic City. Satisfied with his performance up to that point, Kaye asked Rosefielde to work for him full-time. Rosefielde accepted and became COO for Flagship and Atlantic Palace. Effective January 2003, Kaye and his companies engaged Rosefielde as an independent contractor, functioning as COO. According to Rosefielde, Kaye promised to reimburse him for travel between his home in Florida and the offices in Atlantic City. As a corporate officer, Rosefielde testified that he was entitled to health benefits and indemnification pursuant to certain provisions in Flagship's bylaws.

The record shows that Rosefielde signed a number of docu-

ments identifying himself as the lawyer for Kaye's companies [8] or as general counsel for Atlantic Palace and Flagship. He submitted monthly statements for "retainers" to both Atlantic Palace and Flagship and also included expenses for travel, meals, entertainment, and medical expenses. Rosefielde's company, Plumrose, was paid on a monthly basis, resulting in an annual fee to Rosefielde totaling $550,000 in 2003 and $551,000 in 2004; reimbursement for expenses was not included.

On January 22, 2003, Kaye sent an interoffice memorandum to all employees at Flagship, Atlantic Palace, and La Sammana, introducing Rosefielde as COO. Kaye described Rosefielde's attributes as having a "wealth of business knowledge and many successful business ventures *including being an attorney* and a developer of many real estate projects." (Emphasis added). On February 7, 2003, Rosefielde sent a memorandum to all department heads, stating that his approval was required for all contracts; approval of purchase requests exceeding $1000 could be approved by either the COO or the chief financial officer (CFO).

On October 6, 2003, Rosefielde sent a memorandum to all employees, establishing a chain of command for addressing internal complaints that explicitly excluded Kaye as part of the process. Specifically, after detailing the protocol employees were required to follow, Rosefielde concluded the memorandum with this clear admonition: "In no event should any employee request a meeting with the President/C.E.O. (Bruce Kaye). Failure to adhere to this policy will result in disciplinary action up to and including termination."

---

[8] In a letter sent to a mortgagor indebted to Flagship Resort, Rosefielde identified himself as an attorney "retained [by Flagship] to initiate a foreclosure against" the mortgagor. The letter, dated October 25, 2004, is on letterhead of Rosefielde's law office in New York City. In the letter, Rosefielde offers the debtor a settlement in lieu of foreclosure that would require the debtor to submit a quit claim deed transferring title of the property to Flagship. To what extent this document is proof of Rosefielde practicing law in New Jersey is an issue to be considered by the factfinder.

Kaye testified that he considered Rosefielde his corporate attorney, his business attorney, his trust attorney, and his personal attorney. Susan Tunney, former vice president of operations at Flagship, testified that Kaye first introduced Rosefielde as COO. Tunney testified that, sometime after a dinner in 2002, Kaye told her that Rosefielde was an attorney who would be handling all matters with other attorneys. This was particularly significant to Tunney, because she had been dealing directly with other attorneys as part of her role as vice president of operations. Tunney also testified that she accompanied Rosefielde to the federal courthouse in Camden in connection with a case and witnessed Rosefielde identify himself as an attorney to the marshals guarding the courthouse entrance.

Although there was contradictory testimony whether Rosefielde was initially hired to serve as both COO and general counsel, there were numerous occasions where Rosefielde identified himself as general counsel. He also stated at business meetings that he was the only attorney and only person present authorized to offer a legal opinion for the companies. Michael Valenti, the CFO for Atlantic Palace and Flagship, testified that he considered Rosefielde as general counsel and a lawyer. Employees were not permitted to call an outside attorney without Rosefielde's permission. Kaye testified that his oversight of Rosefielde's activities was minimal and left operational and legal matters to Rosefielde, because he hired him to be both COO and general counsel.

In a memorandum dated March 12, 2004, addressed to the staff of all of the companies, Kaye made clear that in order to "implement [his] vision" and "move [the] organization into the twenty first century," he needed to "devote [his] time entirely as [CEO] and creating plans for [the companies'] future." Because this would require "complete attention" on his part, Kaye "decided to turn over all operational functions to the [COO], Alan Rosefielde." Kaye thus ordered "all departments and divisions without exception, including all aspects of Sales, [to report] to [Rosefielde] effective immediately."

## III

Rosefielde assumed the role of de facto CEO and de jure general counsel with great fervor. He renegotiated and restructured lending relationships with Heller Financial, a subsidiary of General Electric, and with Liberty, H.S.B.C., Finova, and Textron; he also oversaw litigation against Wellington Financial Corp. According to Rosefielde, Kaye was thrilled with the results. Commensurately, Rosefielde took advantage of the amenities and prerogatives associated with his position. He regularly dined with managers and took employees and family members to dinner. In his deposition, Kaye admitted that he was aware of Rosefielde's lavish expenses, dinners, and other ostensibly improper behavior. He was willing to tolerate such conduct due mostly to Rosefielde's success in refinancing the companies' debt.

### A

### *LA SAMMANA VENTURES*

La Sammana was a hotel and condominium in Brigantine, which Kaye planned to convert into timeshare units. Kaye created the legal entity "La Sammana Ventures" to own the property.

The operating agreement for La Sammana revealed that Kaye held a 70 percent ownership; the remaining 30 percent was equally divided as follows: 10 percent to a Florida lawyer named Dennis Richard; 10 percent held by JFL Ventures, a company owned by Joseph Lattuga, director of sales at Flagship and Atlantic Palace; and 10 percent by the 2000 Bruce Kaye Dynasty Trust, which Kaye had created to benefit his two adult children.

According to Tunney, Rosefielde attempted to sabotage Kaye's relationship with Lattuga as a means of surreptitiously acquiring Lattuga's interest in La Sammana. Kaye testified that, beginning in 2004, Rosefielde began to question Lattuga's abilities regarding his role in the business and whether Lattuga merited the salary he was receiving. This coincided with a change in the "culture" of

the business initiated by Kaye in 2001 as a means of keeping up with the changes in the market.

Despite Rosefielde's persistent criticism of Lattuga's business performance, Kaye testified that he intended to remain loyal to Lattuga. Kaye and Lattuga had had a successful business relationship for over ten years. Kaye testified that Lattuga willingly relocated from Virginia to New Jersey to join Kaye's then startup operation, leaving a lucrative job that paid Lattuga in excess of $150,000 annually.

On or about February 1, 2004, Rosefielde prepared a letter of separation from the company for Lattuga to sign, proposing a severance package. Rosefielde sent the proposed separation agreement to Kevin Wolfe, one of Kaye's outside counsel. The agreement included a provision for La Sammana to buy back Lattuga's 10 percent interest. However, there was also a separate "assignment of interest form" included for Lattuga to sign. This document had a blank space for the recipient of his interest. Wolfe made only stylistic changes to the document and was not involved in the assignment of Lattuga's interest.

Kaye discovered Rosefielde's alleged scheme to acquire Lattuga's 10 percent interest in La Sammana only when he learned that, approximately a month before the draft separation agreement was prepared, Rosefielde had called Jerry Price, C.P.A., to inquire as to the tax consequences of Lattuga's interest upon transfer.[9] Kaye testified that at the time, he did not know about this call between Rosefielde and Price.

The final agreement assigned Lattuga's 10 percent interest to one of Rosefielde's corporations, not to La Sammana. Rosefielde testified that both Wolfe and Kaye were aware of this arrangement. Kaye testified that he did not learn about the assignment until late 2004 or early 2005; Wolfe corroborated Kaye's testimony in this respect. On July 11 and 16, 2004, Kaye and the Lattugas,

---

[9] Kaye testified that Lattuga paid $200,000 for his 10 percent ownership interest in La Sammana.

(Joseph and his wife), signed the agreement; Rosefielde thereafter accepted the interest in La Sammana without paying any kind of consideration or purchase price.

Joseph Lattuga testified that Rosefielde represented him in other unrelated matters through 2004. Rosefielde claimed, however, that in the negotiation leading to Lattuga's separation, he was only representing Flagship and Atlantic Palace and was no longer performing any work for Lattuga and his wife. Despite this, Lattuga testified that Rosefielde never advised him about this apparent conflict of interest nor suggested to him to have an independent attorney review the employment separation agreement. In fact, Rosefielde encouraged Lattuga to accept the separation offer and told him that Kaye did not want to speak to him. This ultimately degenerated into a "he said versus he said" scenario. Kaye testified that Rosefielde was instrumental in the decision to terminate Lattuga. Rosefielde denied that he instigated Kaye to terminate Lattuga and claimed that he encouraged Kaye to work out the problems with Lattuga.

Rosefielde prepared a business plan for La Sammana that described the renovation of the property and the financing arrangement for sales of the timeshare units. He recommended the formation of "La Sammana Management," to oversee hotel operations, collect condominium fees, pay condominium expenses, and market and rent condominium units for individual unit owners. Both Kaye and Valenti, the CFO for Atlantic Palace and Flagship, testified that they believed that the proposed new management entity was not necessary and would needlessly duplicate expenses.

Consistent with the highly contentious nature of this litigation, Rosefielde and Kaye have diametrically different recollections as to how La Sammana Management was formed and the role each man played in its formation. Rosefielde testified that Kaye was represented by Wolfe in this matter and received the benefit of his independent review and ultimate legal opinion as to the content of the management agreement.

As means of emphasizing, or as defendants may reasonably argue melodramatizing the measure of Kaye's conviction on this subject, plaintiffs' trial counsel asked Kaye to look directly at Judge Nugent as he testified that there was not a "shred of truth" in Rosefielde's claim that Wolfe represented him in connection with the creation of La Sammana Management. Rosefielde sent Kaye an email dated February 24, 2003, setting forth some of the details of the agreement, which included a list of the entities and individuals that held an ownership interest in the company.

In exchange for a $1000 contribution, Rose Associates, one of Rosefielde's entities, would receive 15 percent of any distributions made to become a member of La Sammana Management. The agreement named Rosefielde as general manager and included a 10 percent profit-interest to himself, "off the top," [10] as general manager. This gave Rosefielde a 25 percent distribution interest of the company's revenues. Although Kaye also received a 25 percent distribution interest, his net share was actually less than Rosefielde's, because the general manager's 10 percent profit-interest was derived from gross revenues. Kaye testified that he discovered this covert disparity in distribution benefits after the attorney representing him in this litigation brought it to his attention.

Rosefielde's original February 24, 2003 memorandum proposing the creation of the management company did not list a salary for the general manager position. Kaye testified that notations on the second copy of the document show that Rosefielde told him that a salary for the general manager was necessary. Rosefielde originally asked for 10 percent; Kaye testified that they agreed to settle on 5 percent. However, as has been previously noted, the

---

[10] The operating agreement defined "Gross Revenues" as "all Company revenues derived from the ownership and operation of the Business or otherwise, including the financing of receivables in the ordinary course of business, and exclusive of Net Proceeds from Sales or Refinancing of all or any portion of the Business."

final agreement reflected Rosefielde's compensation as general manager to be 10 percent of gross revenues.

Valenti, Tunney, Wolfe, and Rosefielde signed the agreement. In December 2003, after the creation of La Sammana Management, Kaye paid Rosefielde a discretionary bonus of $20,000. In January 2005, Rosefielde hired an expert to prepare a preliminary valuation report as to the value of his ownership interest in La Sammana Management. Based on this report, Rosefielde told Kaye that he would be willing to be "bought out" of La Sammana Management for $72,000.

## B

### BA MANAGEMENT

According to Rosefielde, in September 2004, Kaye asked him to prepare an operating agreement for a new entity to be known as "BA Management," for the purpose of managing the sales at La Sammana. Dated September 7, 2004, the seventeen-page operating agreement Rosefielde prepared reflects a 60 percent ownership interest held by a trust controlled by Kaye; 20 percent ownership interest by Kaye's son, Jason; and the final 20 percent ownership interest by Rose Associates, an entity owned by Rosefielde. Although Rosefielde testified that the agreement was intended to apply only to sales in Brigantine at La Sammana, the agreement, on its face, provides that it "will manage the sale of timeshare units throughout the world."

Once again, despite taking the time to memorialize many of the formative details of the company, the parties' perception and recollection of what actually took place are strikingly different. Kaye testified that he signed the agreement under false pretenses, based on Rosefielde's claim that it had something to do with the trusts for his children. Kaye described the circumstances as follows:

A. I was with Jason, I was getting ready to go back to Miami, he had a conference table in his office and I walked in to say goodbye to everybody, and he

says wait, I have something for you to sign for the kids' trust. So he gave me the signature page, I signed, and then he said and Jason has to sign also. And Jason asked me well, what is this, Dad. I said don't worry, it's for the trust, just sign it. And Jason signed it and we left.

[KAYE'S COUNSEL]: Was [Rosefielde], at that point, functioning as a tax attorney overseeing the trust?

A. Absolutely.

According to Kaye, Rosefielde never disclosed the existence of BA Management to him; the first time he discovered its existence was in January 2005, after Rosefielde's termination.

BA Management's operating agreement provided for a 10 percent management fee to be applied against projected sales of $50,000,000; Thus, Rosefielde's 20 percent share of the projected fees amounted to $1,000,000.

## C

### *MISCELLANEOUS MALFEASANCE*

Flagship's finance manager, Geovanny LoPresti, testified that by 2003, many timeshare unit owners had defaulted on their obligation to pay installment payments on the original purchase price as well as a variety of other general fees. In lieu of instituting formal foreclosure proceedings that would be both costly and time consuming, Rosefielde decided to have LoPresti forge quitclaim deeds [11] to be recorded as a settlement of the outstanding claims. According to LoPresti, Rosefielde's intention was to make this inventory of timeshare units available once again for remarketing. LoPresti testified that Rosefielde offered him compensation for each deed. According to LoPresti, when he refused to go along with this scheme, Rosefielde harassed, pursued, and intimidated him. When this proved ineffective, Rosefielde threatened to fire him if he did not forge the deeds.

---

[11] A quitclaim deed is a "deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor proffers that the title is valid." Black's Law Dictionary 446 (8th ed.2004).

Rosefielde denied instructing LoPresti or anyone else to forge deeds. According to Rosefielde, Kaye complained to him that LoPresti no longer wanted to forge deeds. Rosefielde then advised Kaye not to get involved in illegal activity.

Robert Glass, who had worked with LoPresti at Flagship, testified that, by June 2003, he told Rosefielde that he suspected that Michael Hogan, who also worked in the same office at Flagship, may have been forging quitclaim deeds; Hogan was turning in a "disproportionate amount" of quitclaim deeds as compared to Glass. In addition, timeshares owned by people from different states had their signatures notarized in their respective quitclaim deed on the same day and by the same notary, who was also Hogan's girlfriend.

Glass testified that Rosefielde never told him to forge deeds. Although Hogan at first denied that Rosefielde directed him to forge deeds, he admitted that at one point Rosefielde had offered him $300 for each forged deed; he ultimately opted to exercise his right against self-incrimination and refused to answer any more questions on this subject. In an email dated September 5, 2003, Valenti informed Rosefielde that he had learned from another source that Hogan was forging deeds. Valenti testified that Rosefielde established a protocol through which questionable deeds would be passed up through the ranks, with Rosefielde being the final arbiter.

In February 2004, the Federal Trade Commission (FTC) started investigating Flagship and Atlantic Palace for violations of the "Do Not Call" regulations, a consumer protection law designed to stop telemarketers from calling people; violations carry the potential for the imposition of large fines that could have bankrupted all of Kaye's companies. The FTC initially proposed a fine of $7.2 million.[12] Rosefielde successfully negotiated with the FTC to

---

[12] Businesses that violate the do-not-call regulations are subject to civil penalties of up to $16,000 per violation. *See* Federal Civil Penalties Inflation Adjustment Act, 74 *Fed.Reg.* 857 (Jan. 9, 2009) (codified at 16 *C.F.R.* § 1.98(d))

reduce the fine to $500,000. Kaye was extremely pleased with the result.

Kaye directed Flagship's outside accounting firm to prepare amended tax returns for Flagship and Atlantic Palace for 2003 that reversed special treatment for interval sales that had dramatically reduced the companies' cash positions. When Rosefielde learned of Kaye's instructions, he immediately objected to the amendments because they would have rendered false the representations he had made to the FTC about the companies' finances to induce the agency to settle the "do-not-call" penalties for only $500,000. According to Rosefielde, he made this issue clear to Kaye.

## D

### *INSURANCE*

At all times relevant to this case, Frank Siracusa was an insurance broker in Atlantic City. Kaye's companies used Siracusa for all of their insurance needs. Siracusa was also Kaye's friend, and the two had similar political affiliations, especially those involving regional and municipal politics. According to plaintiffs, Rosefielde concocted a scheme to profit from Kaye's insurance needs by suggesting, as a cost-saving measure, that Kaye allow another insurance broker to bid for the same coverage provided by Siracusa.

Rosefielde selected the Webster Insurance Agency (Webster) in Connecticut as the broker to compete with Siracusa for Kaye's insurance needs. Unbeknownst to plaintiffs, Webster was owned by Rosefielde's niece, Wendy Newman. Ostensibly based on a lower bid for comparable coverage, Rosefielde awarded Webster the right to provide insurance coverage for all of Kaye's businesses, with the exception of Atlantic Palace, which had its own

---

(increasing the maximum civil penalty from $11,000 to $16,000 per violation, effective February 9, 2009).

independent condominium association board of directors. The Atlantic Palace board decided to continue its business association with Siracusa.

Kaye testified that, when he initially discovered Rosefielde's subterfuge, he wanted to switch back to Siracusa immediately. However, "[s]omebody from [his] office" told him that he would be subject to a $150,000 penalty from Webster if he changed agencies at that point. Kaye switched the accounts back to Siracusa after one year.

In connection with his decision to return to Siracusa, Kaye was asked about threats allegedly made by a Siracusa employee named Ed Donicolatino, a/k/a Ed Donic, who was also active in Atlantic City municipal politics. Specifically, Donic had allegedly threatened that he would arrange to increase the municipal tax assessments of Kaye's properties unless Kaye remained with Siracusa. Kaye and Valenti, CFO for Atlantic Palace and Flagship, both denied being threatened in any manner by Siracusa or anyone associated with him.

## E

### *Paradise Global Realty*

Rosefielde created a wholly owned entity known as Paradise Global Realty (Paradise) to procure group health insurance coverage for the individuals who sold timeshares, whom Rosefielde characterized as independent contractors. Lisa Trefankjian, who at the time of trial was employed as Flagship's guest services resort manager, testified that Rosefielde immediately encountered a coverage problem with his plan. In order to obtain group health coverage, the timeshare sellers needed to be employees of Paradise and work a minimum number of hours. However, Paradise was merely a paper entity that did not have any employees.

According to Trefankjian, to overcome this problem, Rosefielde directed her to complete and sign an Aetna insurance application misrepresenting that the timeshare sellers were employees of

Paradise. Trefankjian also testified that Rosefielde signed a section in the Aetna application intended to be completed by the "CPA or attorney" for the group. At Rosefielde's direction, Trefankjian also created letterhead stationery for Paradise. Using the phony Paradise letterhead, Trefankjian sent a letter to Aetna confirming that "[a]ll sales staff works exclusively for Paradise on a full-time basis."

Rosefielde also drafted a brokerage agreement between Paradise and La Sammana, authorizing Paradise to sell La Sammana timeshares. The brokerage agreement was intended to protect La Sammana from liability for acts performed by the sales staff. Emblematic of the problems the trial court encountered in this case, Rosefielde's testimony in this area can fairly be characterized as murky. He claimed to have no recollection of drafting the agreement, but did not deny that he could have done so. Rosefielde intended for Paradise to contribute 40 percent of the cost of health insurance coverage for the sales staff. He claimed that he told Kaye about the agreement; Kaye denied that Rosefielde ever told him about this scheme to, in essence, commit insurance fraud.

As CFO for Atlantic Palace and Flagship, Valenti also denied that Rosefielde raised any questions with him concerning insurance coverage for the sales staff or discussed what he (Rosefielde) had done with Paradise. Valenti testified that when he looked at the paperwork, he immediately determined that the insurance coverage for the sales staff had been obtained based on false information and cancelled the policy. Valenti thereafter obtained individual policies for the independent contractors who wanted insurance.

## F

### MISAPPROPRIATIONS

Plaintiffs called John Ibone, the director of sales for Atlantic Palace and Flagship, as their principal witness to present evidence of Rosefielde's prodigal expenditures on so-called business-related

matters. In his direct examination, Ibone testified that, three months after Rosefielde began working as COO and general counsel, he gave Ibone a "substantial raise" in salary. When asked to define what he meant by "substantial," Ibone clarified that it was "a little over" $100,000.

Commencing in 2003, Ibone testified that Rosefielde began asking him to report to his office at the end of the workday, around five o'clock in the afternoon, to talk about matters in general while consuming one to two bottles of wine. As explained by Ibone, these social parleys occurred in Rosefielde's office and on a frequent basis: "[S]eventy percent of the time that he was here, so if it was five days [one workweek] it would be three-and-a-half days." Those days were also in succession. According to Ibone, before Rosefielde's arrival, he had never had this kind of social interaction with the second highest official in the Kaye companies.

Ibone also testified that he felt pressured to attend these semi-daily wine-drinking sessions with Rosefielde:

[T]here were many times that, you know, I would have preferred—I just had a newborn baby and built a house that same year, so I would have probably preferred to go home, but I chose to—to go because of . . . I don't know of the proper word but I guess the word is probably a little bit of fear, little bit of— [Rosefielde] has a way of presenting himself. . . .

. . . .

[M]y perception of it was if I didn't do it, I may be like looked at differently. And there were other situations that it happened so I felt, you know, that I had to do that for the position that I was in.

In addition to these social gatherings at Rosefielde's office, soon a "pattern developed," involving the same kind of non-business-related gatherings, but in a more extravagant venue. Rosefielde and Ibone began dining four times a week at a restaurant located inside the Borgata Hotel and Casino in Atlantic City. In fact, Ibone testified that they dined there most of the time when Rosefielde was in town. This continued, according to Ibone, for "at least six months." Again, Ibone characterized these events as "social dinners"; Rosefielde "always paid for everything with his personal credit card." When asked by plaintiffs' counsel if Rose-

fielde always paid with his personal credit card, Ibone responded: "Every time I[saw] the credit card it was personal—I'm not even sure if he had a corporate card to be honest with you."

## G

### THE TRIP TO LAS VEGAS

In March 2004, Ibone wanted to reward the productivity of the sales staff. He thus arranged to have Flagship's top four leaders in sales fly to Las Vegas, Nevada, and stay at the MGM Grand Hotel and Casino (MGM Grand) for three nights, all expenses paid by Flagship.[13] As director of sales, Ibone included himself as a participant. The five men shared a regular room at the MGM Grand; in Ibone's words, the men "bunked together." Although Ibone discussed the trip with Rosefielde, the latter was not included in the arrangements. Ibone did not expect Rosefielde would join them in Las Vegas or otherwise participate in the trip in any manner.

Rosefielde decided differently and flew separately to Las Vegas to join Ibone and the sales team. However, instead of staying at the MGM Grand, Rosefielde booked a penthouse suite at the Bellagio Hotel and Casino (Bellagio), significantly more expensive accommodations as compared with the MGM Grand. According to Ibone, either on the first or second day of the trip, Rosefielde invited him and the four sales-persons to join him for dinner at a steakhouse located in the Bellagio.

When Ibone and the sales team arrived at the steakhouse, they were joined by Rosefielde and "three young ladies" whose names Ibone could not recall. Rosefielde introduced the three women as his "friends." They joined the six men for dinner, which Rosefielde paid for with his personal credit card. Again, Ibone testi-

---

[13] When asked to clarify "expenses," Ibone testified that only airfare, lodging at the MGM Grand, and meals were covered. Gambling and recreational activities were not included.

fied that he assumed it was Rosefielde's personal credit card. However, plaintiffs produced evidence that Flagship paid $4000 for Rosefielde's stay at the Bellagio.

After dinner, Rosefielde, Ibone, the four members of the sales team, and the three women went back to Rosefielde's penthouse suite. Ibone described what he experienced next as follows:

I felt like I was watching a movie—a beautiful, unbelievable penthouse on the top of the Bellagio which we went up to and opened up to a grand piano and just skylights all over the city, you can see it all opened up with windows. It was unbeliev[able]—it was, it was bigger than my house. It was beautiful.

Rosefielde invited the five men to "have a drink" and "socialize." They stayed for approximately three hours. Ibone testified that the following occurred during this time period:

[T]he girls did, I guess—I don't know, what you would call it—a show together, you know, nothing on, nude show, did things to each other, that kind of stuff, and that all happened, and then the three of them went into, just to make it short, three of them went into [Rosefielde's] room and we left.

Rosefielde testified that he did not recall the details of the dinner or very much about the trip. He believed it was a legitimate business expense and that other managers were aware that he had joined the trip.

## H

### SEXUAL MISCONDUCT

Susan Tunney, Flagship's former vice president of operations, was forty-one years old, married, and had two children at the time of trial. She was one of two female employees at Flagship who testified against Rosefielde, alleging inappropriate sexual conduct.

Tunney alleged that Rosefielde inappropriately hugged her and kissed her on the lips each morning. These acts were unwelcomed by her and she made her feelings known to Rosefielde using clear, unequivocal language. Despite her protestations, Rosefielde continued to engage in this conduct, which made her feel extremely anxious and uncomfortable. Rosefielde also had

"pornographic images"[14] as screensavers on his work desk computer.

Tunney also testified about a particular incident in which she and Rosefielde were driving back from a business dinner in Philadelphia. They were the only people in the car. While Tunney drove, Rosefielde "put his hand on [her] knee and ran it up [her] thigh." She was wearing a skirt. He stopped after Tunney told him to stop. When asked if Rosefielde ever apologized, Tunney responded: "He never acknowledged it." According to Tunney, that was not the first time that Rosefielde had touched her in a sexually inappropriate manner. He habitually hugged her and placed his hand on her knee.

Rosefielde admitted that he greeted Tunney with hugs and kisses, but denied ever placing his hand on her thigh or behaving inappropriately. Tunney admitted that she never told Rosefielde she was offended by his greetings or requested that he stop. Tunney did not file a sexual harassment claim against Rosefielde during her tenure at Flagship.

Danielle Leonardis was the other woman employee at Flagship to testify against Rosefielde concerning sexually inappropriate behavior. Leonardis was a bartender employed at the Ozone Restaurant located inside the Flagship. She testified that Rosefielde often came to the bar to drink wine, arranged for her promotion, and gave her very large tips, dinners at other restaurants, invitations to shows, and an inappropriate gift of silk pajamas. Rosefielde testified that he had no recollection of buying Leonardis silk pajamas.

Leonardis testified that Rosefielde's unwelcomed attention made her very uncomfortable. She ultimately resigned from her job at Flagship, claiming that Rosefielde's conduct caused needless tension in her relationship with her boyfriend; she was also disturbed by rumors that she and Rosefielde had had a clandes-

---

[14] These were images of young women dressed in extremely revealing beachware, spanking each other on the buttocks.

tine sexual relationship. As was the case with Tunney, however, Leonardis never filed a sexual harassment complaint against Rosefielde.

## I

## ROSEFIELDE'S TERMINATION

On January 13, 2005, Kaye terminated Rosefielde's employment as general counsel and COO. He told Rosefielde that they had different business philosophies and should not work together on a full-time basis. Despite this, Kaye initially wanted Rosefielde to remain as a consultant, primarily so he would be available as a witness in another court case.

## IV

## THE LEGAL MALPRACTICE ACTION

Counts one, two, and three of plaintiffs' original complaint included the term "legal malpractice" among two other theories of liability against Rosefielde. These three counts were principally predicated on allegations of fraud and breach of fiduciary duties by Rosefielde in his role as COO and general counsel. By contrast, count four identified "legal malpractice" as the exclusive basis for recovery based on the following allegations:

29. In the discharge of his responsibilities as legal counsel to plaintiffs Kaye/Entities, defendant Alan P. Rosefielde was responsible to assume compliance by all plaintiffs Kaye/Entities with local, State and Federal law and regulations. This includes 15 United States Code Annotated 1601, commonly known as the "Do not call law". Defendant Alan P. Rosefielde was specifically instructed by one or more of plaintiffs Kaye/Entities to install all necessary computer software to place plaintiffs Kaye/Entities into compliance with the law. Rather than follow those instructions, he disregarded them, by claiming that the cost was too high and the risk acceptable.

30. As a direct and proximate cause of his dereliction, plaintiffs Kaye/Entities were investigated and prosecuted by the Federal Trade Commission, the result being a $500,000.00 fine and legal fees and costs approximating $200,000.00. All of this was directly occasioned by the negligent legal representation provided by defendant Alan P. Rosefielde.

Plaintiffs called attorney Carl Poplar as an expert on the Rules of Professional Conduct (RPC), legal malpractice, and attorney ethics. Poplar opined that Rosefielde violated *RPC* 1.7(a) and *RPC* 1.8, ethical rules prohibiting an attorney from engaging in conduct that creates a conflict of interest between the attorney and the client. Specifically, Poplar opined that Rosefielde violated these rules when he: (1) served as an attorney for the Lattugas; (2) took advantage of his position as general counsel to obtain an interests in La Sammana Management and La Sammana Ventures; and (3) drafted the BA Management agreement.

According to Poplar, under *RPC* 5.5(b)(2), an attorney is permitted to function as in-house counsel for a New Jersey company without being admitted to practice law in New Jersey, as long as he or she complies with the registration requirements of *Rule* 1:27–2, remains in good standing in other states, and certifies compliance with certain other laws, rules, and regulations.

Poplar testified that although Rosefielde could function as in-house in 2003, he was not authorized to prosecute or defend a case or otherwise appear in a New Jersey courtroom as the legal representative of a person or legal entity. According to Poplar, by Rosefielde's own admission he was not in compliance with the requirements of *Rule* 1:27–2 as of January 1, 2004. Rosefielde had not been admitted to practice law in New Jersey and had not registered with the New Jersey Supreme Court as an out-of-state attorney functioning as in-house counsel.

Based on his review of the record, Poplar concluded that Rosefielde had an attorney-client relationship with Flagship, Atlantic Palace, La Sammana, Kaye, the Lattugas, and JFL Ventures. Poplar testified that Rosefielde acknowledged to him that he was the attorney for Flagship, Atlantic Palace, and La Sammana. Kaye also believed and considered Rosefielde to be the legal representative and counsel for these entities. In Poplar's opinion, "the reasonable perception of a client ... not the self-serving intention of the attorney" controls.

After reviewing "the documentation and testimony of the topic," Poplar testified that, commencing in 2002 until the time of trial, Rosefielde had an attorney/client relationship with the Lattugas. Rosefielde gave them advice on tax matters and was paid a retainer of $800 per month. Rosefielde was the registered agent for JFL Ventures and prepared and filed the incorporation documents as an attorney. In Poplar's opinion, an attorney who incorporates a business entity performs a legal service for the client.

*RPC* 1.7(a) prohibits an attorney from representing a client if the representation of the client will be "directly adverse" to the interest of another client or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client" or the attorney's own "personal interest." Poplar testified that Rosefielde should not have represented the Lattugas as their personal lawyer while he was also serving as general counsel to Joseph Lattuga's employer, as well as Kaye and his business entities. Poplar explained as follows:

> Mr. Kaye perceived Mr. Rosefielde as his attorney and the Lattugas perceived Mr. Rosefielde's activity as attorney, and I viewed his, Mr. Rosefielde's activity as attorney representing each side in this transaction, and this was a transaction involving a substantial amount of money and it was a transaction in which both sides had economic interest.

Poplar saw nothing in the record that would have satisfied the disclosure requirements under *RPC* 1.7(b), permitting a possible waiver by the clients of the attorney's conflict of interest. Poplar also rejected as "fallacious" any attempt by Rosefielde to exempt himself from his ethical obligations as an attorney by suggesting that, at the time he prepared Lattuga's separation agreement from Kaye, he was acting within his dual role as COO. Finally, Poplar noted that Rosefielde's acquisition of a 10 percent ownership interest in La Sammana may have also violated federal and state criminal laws.

Although Judge Nugent struck Poplar's testimony referring to any possible criminal culpability, he allowed counsel to elicit from

Poplar an opinion on the standard used to determine the civil implications of attorney theft of a client's property. Poplar testified that, in a transaction like the one at issue, an attorney has a duty of fidelity, loyalty, and good faith in dealing with an employer. According to Poplar, lawyers who also function as an employee of the client have a duty not to misappropriate a client's property or take anything belonging to the client/employer. Like any other employee, a lawyer has a general duty of good faith and fair dealing in his or her dealings with his or her employer.

In Poplar's opinion, Rosefielde violated this duty of good faith and fair dealing by spending thousands of dollars in nonbusiness-related activities, such as the consumption of high-end wines, charges for a personal gym trainer, and personal travel between New Jersey and Florida. By contrast and notable irony, Rosefielde closely scrutinized employees' applications for reimbursement and often rejected expense vouchers submitted by subordinate employees. In a policy statement prepared by Rosefielde himself, subordinate employees were required to submit vouchers with specificity. Employees seeking reimbursement of or authorization for entertainment and meal expenses were to comply with IRS guidelines. Any reimbursed expenses that were thereafter deemed unreasonable would be imputed as income and taxed accordingly.

Poplar testified that the operating agreement Rosefielde drafted in March 2003 for La Sammana Management was intended "to create a management system for the ... Brigantine property." Although Rosefielde viewed drafting this document as part of his responsibilities as COO, Poplar opined that when a lawyer drafts a legal document, he or she is acting as an attorney, notwithstanding any other title or relationship he or she may have had at the time with the client.

Given the conflict of interest restrictions in *RPC* 1.8(a), Poplar found troubling that the agreement Rosefielde drafted provided for him to receive compensation for serving as president of La

Sammana Management, in the form of 10 percent [15] interest of the company's gross revenues. Poplar opined that, as an employee and an attorney, Rosefielde was ethically barred from obtaining an interest in a client's business under *RPC* 1.8, unless he specifically made the client aware of his or her right to get independent counsel to provide the client with an objective, unbiased assessment of the document at issue.

Poplar thus opined that Rosefielde committed legal malpractice by: (1) drafting the management agreement; (2) executing the agreement as a representative of a legal entity with a proprietary interest in the business; and (3) obtaining an interest in the business in the form of compensation for management services. Polar also concluded that these actions by Rosefielde also violated his ethical obligations under *RPC* 1.8.

Poplar also opined that Rosefielde committed malpractice when he created the BA Management operating agreement. This agreement began with the hubristic goal of deriving profits "throughout the world" from the management of timeshares of Kaye-owned companies. Because the agreement appeared to promote Rosefielde's self-interest at the expense of his client, Poplar opined that BA Management was tainted by the same conflict of interest problems as La Sammana Management.

At the same time Rosefielde was acting as general counsel, Kaye's personal attorney, and COO of the Atlantic City properties, he prepared the BA Management agreement to provide an ownership distribution interest showing 60 percent to the Bruce Kaye Revocable Trust, 20 percent to Jason Kaye, and 20 percent to Rose Associates. In Poplar's opinion, Rosefielde's misconduct in the BA Management documents was more insidious as compared

---

[15] Poplar testified that the original draft agreement dated March 2003 provided for Rosefielde to be paid 5 percent of profits as compensation for serving as "general manager." Poplar was unable to explain how the compensation rose to 10 percent of gross revenues. Poplar emphasized that he could find "nothing . . . in Mr. Kaye's testimony that he had any knowledge that it went from a 5 to a 10 percent fee."

with La Sammana Management, because, at the time he drafted the BA Management agreement, Rosefielde knew Kaye's mental acuity was significantly compromised by his preoccupation with a recent diagnosis of cancer, which also exacerbated Kaye's longtime struggle with alcoholism.

Under these circumstances, Rosefielde not only had a duty to avoid a conflict of interest under *RPC* 1.8(a), he also had an ethical duty, and arguably a higher moral responsibility, to take affirmative measures to protect Kaye's interests in light of his failing cognitive abilities. According to Poplar, under *RPC* 1.14(b), Rosefielde had reason to believe that Kaye's health problems may have impaired his judgment, and diminished his normal cognitive functions and reasoning abilities. Poplar opined that Rosefielde not only violated *RPC* 1.8(a)(1) and *RPC* 1.14(b), but also committed legal malpractice by failing to advise Kaye to consult with an independent attorney before signing the BA Management agreement.

Defendants called attorney Warren W. Faulk as their expert witness on legal malpractice. Faulk opined that Rosefielde did not violate *RPC* 1.8. According to Faulk, the events that lead to the formation of the BA Management agreement were not a transaction between a lawyer and his client, but a "business venture" engaged in by two "business men." According to Faulk, even assuming the existence at the time of an attorney-client relationship between Rosefielde and Kaye, "there was no damage [and] no proximate cause."

With respect to La Sammana Management, Faulk testified that Rosefielde did not commit legal malpractice because none of the individuals involved were his clients.[16] According to Faulk, "it's pretty clear that [Rosefielde] was acting in a business capacity in

[16] In response to a question asked by defense counsel, Faulk named the following individuals or entities he believed were involved with La Sammana Management: "Bruce Kaye Dynasty Trust, Howard Alter, Susan Tunney, Michael Valenti, Rose Associates of Miami, which is Mr. Rosefielde, Ronnie Stransky and Kenneth Wolfe."

this regard as opposed to an attorney." Defense counsel also asked Faulk to opine as to whether Rosefielde "violated any legal standards in connection with the Lattuga Settlement Agreement and ... the resulted La Sammana Ventures Interests."

According to Faulk, he was not certain whether the conflict of interest restrictions in *RPC* 1.8 applied to Rosefielde as in-house counsel. Based on the case law he reviewed, Faulk concluded that *RPC* 1.8 was intended to apply only "to attorneys in private practice dealing with private clients and entering into the transactions [sic] such as taking a mortgage on their home for purposes of securing a fee in a divorce case."

In Faulk's view, Rosefielde's clients in the Lattuga matter were Atlantic Palace and Flagship. Although Rosefielde acquired Lattuga's interest in La Sammana, Faulk believed any potential problems were cured when Rosefielde sent the documents to Kaye's outside counsel, and made all of the information known to Valenti as the CFO. In fact, Faulk opined that Rosefielde did "probably more than" *Rule* 1.8 requires.

## V

### *JUDGE PERSKIE'S CONDUCT*

A key part of defendants' argument in this appeal and affirmative claims against plaintiffs involved the question of insurance coverage of Kaye's entities. As the Court noted in *In re Perskie:*

> In essence, the *Kaye* litigation was a business dispute involving various issues stemming from Mr. Rosefielde's employment with a time-share business based in Atlantic City, the Flagship Resorts Development Corporation (Flagship), and his eventual termination from Flagship. Mr. Rosefielde maintained that his termination was a result of his recommendation that Flagship end its business relationship with an insurance broker, Frank Siracusa, who according to Rosefielde, allegedly had engaged in improper and questionable business practices. As found in the Presentment, the ACJC concluded that "objective, reasonable and fully informed observers would have sincere doubts about [Judge Perskie's] impartiality based on Mr. Siracusa's role in the case and the nature and extent of Respondent's relationship with Mr. Siracusa."
>
> [207 *N.J.* at 281, 24 *A.*3d 277.]

Judge Perskie acknowledged his conflict of interest and accepted the Supreme Court's conclusion that he violated *Canons* 1, 2A, and 3C(1) of the *Code of Judicial Conduct* and *Rule* 1:12–1(f) of the New Jersey Court Rules by failing "to disqualify himself from *Kaye* in accordance with pertinent strictures, and by this conduct, failed to uphold the integrity and independence of the Judiciary and failed to promote public confidence therein." *Id.* at 283, 24 A.3d 277 (quoting ACJC findings).

Unfortunately, Judge Perskie's involvement and interactions with this case did not end at this point. This appeal also requires us to address Judge Perskie's conduct after the case was reassigned to Judge Nugent for trial. We again quote from the relevant part of the Court's decision in *In re Perskie:*

Count III of the Formal Complaint charges that Respondent made two appearances in the back of Judge Nugent's courtroom during the *Kaye* trial after Respondent had recused himself on his own motion from the case, and that those appearances were "inappropriate and demonstrated or created the appearance that Respondent had an interest in or supported the plaintiffs" case. *Respondent admits making the appearances, remaining in Judge Nugent's courtroom for approximately one hour on each occasion, and speaking with one of Mr. Kaye's attorneys during his second appearance.*

While there are factual disputes concerning the exact day of Respondent's second appearance, who he spoke with on that occasion, and what exactly was discussed, those disputes do not need to be resolved for the purposes of our disposition of Count III. For our purposes, it is sufficient that Respondent not only admits the two uninvited appearances, he also concedes, as pointed out by his attorney in his Post–Hearing Brief, that "he should not have gone into Judge Nugent's courtroom, or spoken to plaintiff's counsel, after having recused himself from the [*Kaye*] case. In these circumstances, that conduct was ill-considered. . . ." [ ]

We could not agree with Respondent more. As we indicated previously, recusal connotes and demands complete separation. By appearing and staying in the back of Judge Nugent's courtroom to watch the *Kaye* trial after he had recused himself from the case, Respondent deviated from that demand not once, but twice. In so doing, he created, at a minimum, the unacceptable appearance that he still had an interest in the case. In fact, both Mr. Rosefielde and Mr. Fram [his trial attorney] were impacted by Respondent's appearances and interpreted those appearances as a show of support for the plaintiffs. Given the history of Respondent's interface with *Kaye*, we find their interpretation reasonable and further believe that a reasonable, objective observer might have the same reaction or, at a minimum, question the motivation behind Respondent's visits. Either way, such questions demonstrate the impropriety of Respondent's conduct under the *Code of Judicial*

*Conduct.* The mandate, expected of all judicial officers, to maintain and uphold the integrity and independence of the Judiciary is sacrosanct and without limit. *See* Canons 1 and 2 of the *Code of Judicial Conduct.* By personally appearing and observing the trial of a case from which he was recused on two separate occasions, Respondent allowed that integrity and independence to be called into question and, consequently, flouted his judicial obligations and responsibilities. As a result of this finding, we further conclude that Respondent's conduct violated Canons 1, 2A and 2B of the *Code of Judicial Conduct.*

[*Id.* at 283–84, 24 *A.*3d 277 (alterations in original) (quoting ACJC decision).]

Defendants emphasized that Judge Perskie actively managed this case and decided a number of pretrial motions during the one-year period before he finally recused himself. According to defendants, during this time period, Judge Perskie repeatedly ruled in plaintiffs' favor "on important motions that defined the issues to be tried and how those issues would be tried." Defendants maintain that Judge Perskie "compounded his error by forcing Rosefielde's counsel to file a formal motion for recusal, by denying that motion, and by leveling unjustified criticisms at Rosefielde's counsel." However, defendants do not cite to specific parts of the record to support these generalized allegations or present any details of what they consider to be unjustified.

Defendants also claim that upon disqualification, Judge Perskie should have followed the requirements of *Rule* 1:12–3(a), which provides, in relevant part as follows:

In the event of the disqualification or inability for any reason of a judge to hear any pending matter before or after trial, another judge of the court in which the matter is pending or a judge temporarily assigned to hear the matter shall be designated by the Chief Justice or by the Assignment Judge of the county where the matter is pending. . . .

Finally, defendants claim that Judge Perskie's appearances in court during the trial presided over by Judge Nugent improperly conveyed to Judge Nugent that Judge Perskie had an ongoing interest in the outcome of the case.

■ We do not discern any connection between Judge Perskie's conduct, either before or after his recusal, and the factual findings and legal conclusions reached by Judge Nugent. There is absolutely no evidence that Judge Perskie's ill-advised decision to visit the trial while in progress before Judge Nugent, and at one point

approach and speak to plaintiffs' counsel, in any way affected the impartiality of the proceedings presided over by Judge Nugent. Any suggestion or innuendo impugning the integrity of the proceedings presided over by Judge Nugent is not supported by the record. We therefore categorically reject any implication suggesting otherwise.

There is also no evidence or basis to question Judge Nugent's ability as the fact-finder to review Siracusa's testimony fairly and impartially. Whatever taint Siracusa's relationship with Judge Perskie may have had on the fairness of these proceedings was completely purged by Judge Nugent's unquestioned impartiality. This trial was decided on the merits of the parties' case. Our role as an intermediate appellate court is to review the rulings of the trial court. Any disagreement we may have with any of Judge Nugent's rulings is based entirely on our views of the legal principles involved.

## VI

### THE DOCTRINE OF ACILLARY JURISDICTION

Plaintiffs' original complaint filed in the Chancery Division was grounded on three interrelated theories of liability: breach of fiduciary duty, legal malpractice, and civil fraud. In determining whether a cause of action is predicated on equitable or legal grounds, the remedy sought by the parties "remains the most persuasive factor." *Weinisch v. Sawyer*, 123 *N.J.* 333, 344, 587 *A.*2d 615 (1991) (citing *Shaner v. Horizon Bankcorp.*, 116 *N.J.* 433, 450–51, 561 *A.*2d 1130 (1989)). Here, plaintiffs sought the following primary forms of relief:

A. An Order *rescinding* and rendering null and void the July 9, 2004 document captioned "Assignment of Member's Interest in La Sammana Ventures, LLC" executed by Joseph Lattuga, President of J.F.L. Ventures, Inc. in favor of defendants Rose Associates, Inc. of Miami and Alan P. Rosefielde, President.

B. *Rescinding* and rendering null and void those portions of the May 1, 2003 document captioned "Operating Agreement of La Sammana Management, LLC" insofar as they refer to or award to defendant Alan P. Rosefielde or defendant Rose Associates, Inc. of Miami any title, appointment as General Manager or

otherwise, designation as Chief Executive Officer and President or otherwise, fees and out of pocket expenses, membership interests or entitlement to distributions or, in the alternative, so reforming the Agreement.

C. *Disgorgement* and return of all payments, profits, disbursements and other funds received by any defendant pursuant to those documents.

D. *Rescinding* and rendering null and void the entirety of the document captioned "Operating Agreement BA Management, LLC" dated September 7, 2004.

E. *Enjoining and restraining* defendants Alan P. Rosefielde, Rose Associates, Inc. of Miami, and Plumrose Company, Inc. from acting in the interest of or on behalf of and from representing themselves as members, agents or representatives of all plaintiffs Kaye/Entities and defendant La Sammana Management, LLC and defendant BA Management, LLC.

F. *Compensatory damages* including, but not limited to, the full amount of the FTC fine and all associated legal fees and costs and for all non-business expenses fraudulently extracted from plaintiffs Kaye/Entities.

[ (Emphasis added).]

Except for the demand of compensatory damages, all of the other forms of relief sought by plaintiffs are inherently equitable in nature. We are thus satisfied that the complaint was properly filed in and accepted by the Chancery Division. *R.* 4:3–1(a)(1).

 Rosefielde argues that Judge Nugent erred when he denied his motion to transfer his statutory cause of action under CEPA and common law claim of breach of contract to the Law Division for a jury trial. According to Rosefielde, despite his status as COO and general counsel, he functioned as Kaye's employee [17] and was entitled to prosecute his CEPA action before a jury as the Legislature provided under *N.J.S.A.* 34:19–5. He also argues that Art I, Paragraph 9 of the New Jersey Constitution guarantees him the right to a jury trial on his common law claim that Kaye violated an oral contract.

Judge Nugent rejected these arguments and denied Rosefielde's motion to bifurcate the proceedings before him and transfer these two discrete claims to the Law Division for trial before a jury.

---

[17] *N.J.S.A.* 34:19–2(b) defines "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." *See also D'Annunzio v. Prudential Ins. Co. of Am.,* 192 *N.J.* 110, 120–22, 927 *A.*2d 113 (2007).

Judge Nugent explained his ruling in a memorandum of opinion dated April 5, 2007. He framed the issues before him as follows:

The Defendants ... bring this motion seeking an order severing the equitable claims recited in the first three counts [18] of the Plaintiffs' Second Amended Complaint ("the Complaint") for trial in the Chancery Division where this action was filed and remains pending, and transferring the legal claims recited in Counts Four, Five, and Seven' 19 of the Complaint to the Law Division for a jury trial. Count Six of the Complaint has been dismissed.[20] Alternatively, the Defendants request that the court allow a jury trial on all legal claims recited in the Complaint, in the Defendants' counterclaim, and in the Defendants' third-party complaint.[21] The Defendants argue that with the exception of the first three counts of the plaintiffs' complaint, the plaintiffs' claims are legal, not equitable, and the court does not have ancillary jurisdiction over the legal claims because they are not "incidental or essential" to the determination of the equitable issues.

Relying primarily on our Supreme Court's holding in *Lyn–Anna, supra*, Judge Nugent denied defendants' motion. After reviewing defendants' contentions in their counterclaim and canvassing the relevant cases that have addressed this question, Judge Nugent reached the following conclusion:

The thread that weaves through and binds together the issues and claims in the Complaint and Counterclaim is the fiduciary relationship between and among the parties. Rosefielde, in his capacity as a lawyer, owed fiduciary duties to the

---

18 The first three counts of plaintiffs' second amended complaint alleged identical theories of liability: "Breach of Fiduciary Responsibility, Fraud, and Legal Malpractice."

19 Count four alleged legal malpractice, count five alleged "Legal Malpractice and Theft," and count seven alleged "Breach of Fiduciary Duty, Fraud, and Unfaithful Servant."

20 Count Six alleged "Unlicensed Practice of Law" in violation of *RPC* 5.5 and *N.J.S.A.* 2C:21–22, which renders the knowing unauthorized practice a criminal offense potentially punishable by term of imprisonment of between three to five years. Although the Criminal Code does not provide for a private cause of action, we presume plaintiffs included this statutory reference to support their claim of civil theft.

21 Defendants filed a third-party complaint on August 23, 2006, against a number of Kaye-affiliated entities and attorneys who may have been retained or used by Kaye as outside counsel. Defendants primarily sought contribution and compensatory damages from these third-party defendants. The outcome of this cause of action is not germane to the issues before us.

entities and individuals who relied upon his legal expertise. In his capacity as Chief Operating Officer of the Kaye entities, he owed fiduciary duties to the business entities he operated. Rosefielde's alleged breach of his fiduciary duties underpins the plaintiffs' equitable and legal claims, including their claims that he committed legal malpractice when he acquired ownership and monetary interests in the LLCs (Counts One through Three of the Complaint), when he exposed Kaye entities to substantial FCC fines (Count Four) and when he instituted the system that enabled him to inflate and falsify his business expenses (Count Five). The plaintiffs allege explicitly that [Rosefielde] breached his fiduciary duties, committed fraud, and was an unfaithful servant when he allegedly aided the Kaye entities' competitors and committed a laundry list of acts of misfeasance during his tenure as General Counsel and Chief Operating Officer (Count Seven).

. . ..

Although defendant Rosefielde's CEPA and Breach of Contract claims are legal in nature and are claims for monetary damages, the plaintiffs' proofs on their equitable claims will also be offered in defense of Rosefielde's CEPA and Breach of Contract claims. In that regard, the plaintiffs represent that they intend to call at trial nine witnesses who will testify on the majority of issues raised in the Complaint and Counterclaim. One witness, the plaintiff's legal malpractice expert, will give testimony about Rosefielde's alleged malpractice with respect to all of the plaintiffs' claims.

. . . .

The core of the controversy in the instant action centers on the fiduciary relationship among the parties, just as it did in *Lyn–Anna Properties*. The equitable and legal claims of the parties and the overlapping proofs are so interrelated and intertwined that the legal claims are properly deemed ancillary to the equitable claims.

Given Judge Nugent's reliance on *Lyn–Anna*, we will begin our analysis by summarizing the salient facts confronted by the Supreme Court in that case. The question in *Lyn–Anna* concerned "whether in a pending equitable action between business partners, the Chancery Division may retain jurisdiction over a compulsory counterclaim asserted by one group of partners against another group of partners for legal malpractice related to the partnership affairs." 145 *N.J.* at 315, 678 *A.*2d 683.

The controversy in *Lyn–Anna* "arose out of a failed real estate development project" to construct a ninety-six-unit condominium complex in North Miami Beach, Florida. *Id.* at 315–16, 678 *A.*2d 683. The project was originally intended to be a joint venture between Lyn–Anna Properties (Lyn–Anna), a limited partnership owned by plaintiffs Alan Husack and attorney Alan Kipnis, and

Harborview Development Corporation (Harborview), "a real estate development corporation owned by" Robert Notte. *Id.* at 316, 678 *A.*2d 683.

The project was financially troubled from its inception. The bank the parties found to finance the construction became insolvent in 1986, and the parties were forced to secure alternative financing from another bank. *Ibid.* When additional funds became necessary, Notte brought in his "acquaintance," Phillip Kurens, who, in December 1987, agreed to provide the needed cash in the form of an investment in the project and a share of the profits once it was completed. *Ibid.* Kurens formed Kurens South, Inc., and became a partner with Harborview. He alleged, however, that Kipnis "acted as attorney for Harborview in that matter, and served as escrow agent for the receipt of Kurens'[s] money." *Ibid.*

Despite this infusion of funds from Kurens in late 1987, the project's financial stability proved to be short lived. By the end of 1989, the project was losing money and in need of more funds to survive. *Ibid.* Kurens again agreed to help. This time, however, Kurens wanted a greater ownership interest and operational control of the project. *Ibid.* "On December 12, 1989, Kurens and Harborview entered into an agreement" giving Kurens all of Notte's interest in Harborview and "managerial control" of the project. As a result, Lyn–Anna and Kurens became partners. *Ibid.*

Although the construction project was located in Florida, all of the financial dealings and management decisions occurred in Essex County, New Jersey. *Ibid.* Thus, when the project finally failed in December 1990, Lyn–Anna filed suit in the Chancery Division, Essex County "seeking to restrain the disbursement of funds and to obtain an accounting of monies disbursed." *Ibid.* The plaintiffs accused Kurens of breaching a December 12, 1989 management agreement after he assumed control of Harborview, which, according to the plaintiffs, lead to the financial downfall of the project. *Id.* at 317, 678 *A.*2d 683.

Kurens, the two corporate entities involved (Kurens South, Inc., and Harborview), and Claire Kurens (presumably his wife) filed a counterclaim seeking compensatory damages in the form of financial losses associated with the venture. The defendants' counterclaim, however, "focused on events that occurred between the fall of 1987 and December 12, 1989 ... [and] alleged that Kipnis'[s] conduct constituted legal malpractice and fraud." *Ibid.*

As is the case here, despite having originally and primarily sought equitable relief and causing the joinder of issue in the Chancery Division, all of the parties in *Lyn–Anna* demanded a trial by jury. *Ibid.* The plaintiffs waived their jury-demand two years later in 1992. *Ibid.* Thereafter,

[p]resumably to confirm their continued right to a jury trial in the face of plaintiffs' waiver, defendants then made a motion for a jury trial, which was denied by the trial court in a letter opinion dated February 17, 1993. Following a bench trial, the Chancery Division dismissed both plaintiffs' complaint and defendants' counterclaim with prejudice.

[*Ibid.*]

On the defendants' direct appeal, we affirmed the judgment of the Chancery Division. *Ibid.* The Supreme Court thereafter granted the defendants' petition for certification "limited to the issue of whether the defendants are entitled to a jury trial on their counterclaims for malpractice and fraud." *Ibid.* (citing 142 *N.J.* 454, 663 *A.*2d 1361 (1995)).

Writing for a unanimous Court, Justice O'Hern began his analysis by discussing our State's historical roots and discussing in great detail how the right to a trial by jury was treated, recognized, and evolved from the constitutions of 1776 and 1884, to the great revolutionary reforms embedded in our prevailing 1947 Constitution. *Id.* at 318, 678 *A.*2d 683. With this historical and legal analysis as backdrop, Justice O'Hern explained how two cases decided one year after the adoption of the 1947 Constitution made clear "that a court of equity may properly adjudicate an ancillary legal claim without providing the complainant with a jury trial." *Id.* at 321–22, 678 *A.*2d 683 (citing *Ebling Brewing Co. v. Heirloom, Inc.,* 1 *N.J.* 71, 78–79, 61 *A.*2d 885 (1948) (applying the

doctrine of ancillary jurisdiction to permit the Chancery Division to adjudicate breach of contract and violations of federal price regulation claims raised in the defendant's counterclaim demanding a jury trial); and *Fleischer v. James Drug Stores*, 1 *N.J.* 138, 150, 62 *A.*2d 383 (1948) (holding that a plaintiff who seeks compensatory damages, breach of contract, and tortious interference claims in addition to the equitable relief of specific performance is not entitled to a jury trial in the Chancery Division based on the doctrine of ancillary jurisdiction)).

To illustrate the primacy and scope of the doctrine of ancillary jurisdiction, Justice O'Hern cited with approval the following passage from *Fleischer*, written by Justice Heher:

> It is the settled rule that where equity has rightfully assumed jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of the entire controversy and, except where the jurisdiction of equity depends on the prior establishment of a right at law, settle purely legal rights and grant legal remedies. When the basis of the jurisdiction is once perceived, its scope and extent become readily apparent. The rationale of the rule that an equitable feature draws the cause completely within the cognizance of equity is the policy of avoiding a multiplicity of suits; and so jurisdiction of the whole controversy may be assumed for the doing of complete justice in the one suit. *The constitutional right of trial by jury is, of course, subject to this inherent equitable jurisdiction. Equity has a general jurisdiction to adjudicate ancillary and incidental matters. This jurisdiction is co-extensive with the rights of the parties in the subject-matter of the suit. It may, in the exercise of a sound discretion, do whatever is necessary to a final adjudication of the entire controversy between the parties, whether it encompasses an action ex delicto or one ex contractu.* And it may grant relief to a defendant or between codefendants. It suffices if the matters to be adjudicated be germane to or grow out of the subject-matter of the equitable jurisdiction.
>
> [*Lyn-Anna, supra,* 145 *N.J.* at 322, 678 *A.*2d 683 (emphasis added) (quoting *Fleischer, supra,* 1 *N.J.* at 150, 62 *A.*2d 383).]

One year after *Fleischer*, and two years removed from the adoption of our 1947 Constitution, the Supreme Court decided *Steiner v. Stein*, 2 *N.J.* 367, 66 *A.*2d 719 (1949). The Court reaffirmed its exhortation to our Chancellors to treat our State's constitutional right to a trial by jury as subject to the inherent equitable jurisdiction of the Chancery Division in cases " 'where

equity has rightfully assumed jurisdiction.' " 2 *N.J.* at 374, 66 *A.*2d 719 (quoting *Fleischer, supra,* 1 *N.J.* at 150, 62 *A.*2d 383).[22]

Justice O'Hern specifically noted how the salient facts and circumstances of *Steiner* "were a near mirror-image of the issues" in *Lyn–Anna.*[23] *Lyn–Anna, supra,* 145 *N.J.* at 322, 678 *A.*2d 683. Applying the principles to the facts in *Lyn–Anna,* Justice O'Hern concluded that the Chancery Division had correctly applied the doctrine of ancillary jurisdiction to deny the defendants' motion to transfer the legal claims to the Law Division to be decided by a jury. *Id.* at 332, 678 *A.*2d 683. Justice O'Hern explained his reasoning as follows:

> [A]lthough the claims for relief were ultimately limited to money damages, entitle-ment to relief arose from the fiduciary relationship between and among the parties. Kipnis'[s] duty as an attorney could not be fully divorced from his duty as a prospective partner. So too, Kurens'[s] duties under the contract grew out of his partnership relationship with Kipnis and Husak. The subsequent conduct of Kurens as partner cannot realistically be divorced from the inception of his role in 1987 as a prospective partner of Kipnis and Husak or the expansion of that role in 1989. Notte, the intermediary between Lyn–Anna and Kurens, was the lead-off witness at the trial. Notte invited Kurens to invest in the project after meeting Kurens while Kurens was temporarily employed as a member of Notte's office staff in New Jersey.... In its ultimate findings of fact, the Chancery Division observed that when Kurens increased his stake in the venture in 1989, he was aware of one

[22] In our view, it is important to emphasize that, as noted by Justice O'Hern in *Lyn–Anna,* these cases were decided by individuals who had "closely observed the development of the Constitution of 1947." *Lyn–Anna, supra,* 145 *N.J.* at 323, 678 *A.*2d 683. Indeed, Chief Justice Vanderbilt "contributed to the Judicial Article of the new Constitution." *Ibid.* The contemporaneous nature of these decisions, as related to the adoption of our 1947 Constitution, strengthens the proposition that the proponents and ultimate framers of the right to a jury trial expressed in Article I, Paragraph 9 were aware of the prevailing views of the scope and applicability of the doctrine of ancillary jurisdiction.

[23] In *Steiner,* the plaintiff alleged that the defendant, his former attorney, refused to release to the plaintiff his legal file, as a means by the defendant of obtaining payment for services rendered. 2 *N.J.* at 369, 66 *A.*2d 719. The defendant did not dispute he asserted an attorney's lien on the file. *Ibid.* The plaintiff filed a complaint in the Chancery Division, seeking an injunction directing the defendant to release his files. *Id.* at 370, 66 *A.*2d 719. The defendant counterclaimed for his legal fees and demanded a jury trial. The Court denied the attorney a right to trial by jury on the counterclaim.

of his claims of Kipnis'[s] alleged ethical misconduct in 1987. Kurens had full access to the records that disclosed how the 1987 escrow funds had been handled. *In short, there is no clear cut line of demarcation between the attorney malpractice issues and the partnership management issues. The issues are part of the broader fiduciary relationship among the joint ventures in the Harborview project.*

[*Id.* at 331–32, 678 *A.*2d 683 (emphasis added).]

Finally, to dispel any possible doubts as to its continued viability and scope, the Supreme Court recently reaffirmed the basic tenets of the doctrine of ancillary jurisdiction by citing, with approval, the words written sixty-five years ago by Justice Heher in *Fleischer, supra.* *Wood v. N.J. Mfrs. Ins. Co.,* 206 *N.J.* 562, 575, 21 *A.*3d 1131 (2011); *See also Jersey Cent. Power & Light Co. v. Melcar Util. Co.,* 212 *N.J.* 576, 589, 59 *A.*3d 561 (2013) (reaffirming that in determining whether a jury trial is required under our State Constitution, "both the historical basis of the cause of action and the relief sought must be considered." (citing *Steiner, supra,* 2 *N.J.* at 379–80, 66 *A.*2d 719)).

 Article I, paragraph 9 of the New Jersey Constitution of 1947 emphatically guarantees the right of trial by jury. "The right of trial by jury shall remain inviolate; but the Legislature may authorize the trial of civil causes by a jury of six persons when the matter in dispute does not exceed fifty dollars." [24] *N.J. Const.* art. I, ¶ 9. In our view, these words are plain, unambiguous, and provide for no exception. However, when placed in a proper historical context, the Supreme Court has spoken with equal clarity, by consistently upholding the Chancery Division's power to render the constitutional right of trial by jury "*subject*" to its equitable jurisdiction. Although this seems to us as counterintuitive and in derogation of our understanding of the supremacy of the rights secured to our citizens by our State Constitution,[25] as an

---

[24] By amendment, effective December 4, 1973, the following language was omitted: "when the matter in dispute does not exceed fifty dollars."

[25] "The New Jersey Constitution is the supreme law of this State." *Abbott v. Burke,* 206 *N.J.* 332, 480, 20 *A.*3d 1018 (2011) (Albin, J., concurring); *see also*

intermediate appellate court, we are bound to follow and enforce the decisions of the Supreme Court.

We thus affirm Judge Nugent's ruling denying defendants' motion to transfer the CEPA and breach of contract claims to the Law Division so that they could be decided by a jury. Judge Nugent correctly construed the Supreme Court's holding in *Lyn-Anna* and properly applied the doctrine of ancillary jurisdiction to adjudicate the entire controversy in a single bench trial.

## VII

### *THE TRIAL COURT'S FACTUAL FINDINGS*

Having confirmed the Chancery Division's exercise of jurisdiction, we turn our attention to the trial court's review of the evidence, the legal principles applied, and the ultimate conclusions reached. Initially, Judge Nugent delivered his decision from the bench on July 9, 2007. Thereafter, he memorialized his decision in a memorandum of opinion dated August 10, 2007.[26] Judge Nugent ruled in favor of plaintiffs on almost every claim that they asserted. He succinctly framed the nature of the dispute as follows:

---

*Davenport v. Apportionment Comm'n*, 65 *N.J.* 125, 138, 319 *A.*2d 718 (1974) ("It goes without question that the New Jersey Constitution is the supreme law of this State, representing the fundamental will of the people, upon which all other laws of this State repose.") (Pashman, J., dissenting).

[26] The only material difference between Judge Nugent's oral opinion and his subsequent memorandum concerns the award of punitive damages. In his oral opinion. Judge Nugent announced that the way in which Rosefielde acquired his ownership interest in BA Management constituted civil fraud and warranted an award of punitive damages. Because the record at the time did not contain any information concerning Rosefielde's financial condition, Judge Nugent permitted the parties to submit supplemental evidence for the purpose of determining the ultimate amount of punitive damages to award, including the evidential materials outlined in *N.J.S.A.* 2A:15–5.12(c). In his August 10, 2007 memorandum of opinion, Judge Nugent described the role this supplemental evidence played in his ultimate determination.

> The parties' factual disputes center on the compensation and conduct of [Rosefielde] during his two-year tenure as the officer compensated at $500,000 per year to run three timeshare businesses which [Kaye] principally owned or controlled. The parties' disputes involve nearly every aspect of Rosefielde's tenure with Kaye's companies, including the terms and conditions of Rosefielde's engagement, his compensation and expenses, his title and the scope of his duties, his performance, the duration of his tenure, and the reasons for his termination.
>
> [ (Footnote omitted).]

Judge Nugent found, and the record supports, that Rosefielde's role as a lawyer proved to be the genesis of this civil dispute and the central basis for the liability asserted. From the moment Kaye and Rosefielde were introduced, the former sought and relied on the latter's legal advice for both personal and business-related matters. A self-made man with limited formal education, Kaye relied on Rosefielde for personal tax advice and expected him to oversee his estate planning. Toward that end, Rosefielde created a number of trusts that Kaye believed were intended to shield, as much as legally possible, his personal wealth from taxation, thereby maximizing the size of his estate for the benefit of his children.

From Kaye's perspective, Judge Nugent found that the relationship between these two men evolved over time to the point that Kaye considered Rosefielde to be a "friend and confidant on whom Kaye built an absolute trust." Kaye also arranged for Rosefielde to become a member of the board of directors of Flagship.

According to Judge Nugent, in 2002, five years after the two men first met, Kaye was so impressed with Rosefielde's business acumen that Kaye asked him to run his businesses in Atlantic City on a full-time basis. Kaye saw this as an opportunity "to phase out of the day-to-day management of his businesses, and to devote more time to his family." Rosefielde, however, was not initially receptive to the proposal and agreed only to assist Kaye in the day-to-day management of his Atlantic City operations for a four-month period, from September 2002 to December 2002.

Judge Nugent found that Rosefielde's initial reluctance to accept Kaye's job offer on a full-time basis strengthened Kaye's

resolve to convince Rosefielde to do otherwise. Thus, Kaye asked Rosefielde what it would take to convince him to work for Kaye fulltime. In the end, Kaye agreed to provide Rosefielde a consulting fee of $500,000 per year, payable to Plumrose, Rosefielde's consulting company.[27] Kaye also agreed to provide Rosefielde with a selection of wines and a wine storage cabinet.[28] Finally, because Rosefielde resided in Florida, Kaye agreed to pay Rosefielde's commuting expenses to and from his residence in Florida and Kaye's businesses in Atlantic City. Despite these generous benefits, Rosefielde only agreed to serve in this position for a one-year period.

Of particular relevance and key importance to the events that ultimately lead to this extensive litigation, Judge Nugent found that Rosefielde accepted Kaye's offer on the condition that Rosefielde would have total authority to make all business-related decisions and operate Kaye's entities with absolute autonomy from the board of directors. Judge Nugent found, and the record supports, that Kaye "made an unconditional pact that he would back Rosefielde," and, "[w]ith few exceptions," Kaye "honor[ed] that unconditional pact for nearly two years." [29]

Judge Nugent found, by a preponderance of the credible evidence, that Kaye hired Rosefielde to serve as COO and general counsel to both Flagship and Atlantic Palace. He also found that Rosefielde held himself out as such. Judge Nugent cited to and

---

[27] Judge Nugent found that, by labeling his salary a consulting fee, Rosefielde received a tax benefit that was not available to any other employees of Flagship. Plumrose collected the $500,000 annual fee by submitting bi-weekly invoices.

[28] Rosefielde told Kaye that, as a wine connoisseur, he was concerned that, by accepting the position, he would not have access to the wine collection he kept in his Florida home.

[29] Judge Nugent also found that Kaye made this Faustian bargain knowing that, by giving Rosefielde complete authority to operate Flagship, independent of and not subject to the oversight of its board of directors, Kaye contravened Flagship's bylaws. The parties presented no evidence regarding whether Flagship's board of directors ever considered or approved Rosefielde's hiring.

quoted from a press release, which announced Rosefielde's hiring, described his legal education, professional history, and tax law expertise, and listed a number of famous clients that Rosefielde and his former law partner represented, including "Neil Sedaka, The Bee Gees, Rod Stewart, Bette Midler, and Motown Records." The record also contains overwhelming evidence to support Judge Nugent's finding that Flagship and Atlantic Palace's employees considered Rosefielde to be the companies' attorney.

Judge Nugent found that Rosefielde was practicing law when he acquired his interests in La Sammana Management, La Sammana, and BA Management. Finding Kaye's account of these events credible, the trial court found that Kaye originally hired Rosefielde based on his legal knowledge, training, skill, and ability. Rosefielde used these skills throughout their association. Rosefielde drafted, on behalf of the three companies, the agreements in which he acquired his ownership and income interests. Rosefielde also regularly drafted and edited legal documents for Kaye's entities, such as releases, settlement agreements, and affidavits.

Rosefielde held himself out as general counsel in La Sammana's business plan, a document he helped develop months before acquiring his interest in that company. He also used his legal training and experience in September 2004 when he formed and made himself a part owner of BA Management. Against these findings, Judge Nugent concluded that Rosefielde was practicing law throughout his tenure as COO and general counsel for Flagship and Atlantic Palace.

Judge Nugent also rejected Rosefielde's argument that he neither acted as Kaye's attorney nor performed legal services for Kaye personally. Rosefielde and Kaye interacted with one another as attorney and client. Kaye relied on Rosefielde's guidance and legal advice. Rosefielde represented Kaye in his personal, family, and business matters, and Kaye perceived and considered Rosefielde to be his attorney. Throughout their relationship, both business and personal, Rosefielde did not take any action to clarify that his role as a lawyer was limited to representing the business

entities exclusively, nor Kaye individually. Indeed, a rational fact-finder could reasonably conclude that Rosefielde tacitly, if not actively, encouraged the notion that he was Kaye's point man on all legal matters, whether business related or personal in nature.

Judge Nugent found that Rosefielde disregarded Flagship's bylaws as well as Atlantic Palace's and La Sammana's operating agreements. Rosefielde dealt directly with Kaye, circumventing Flagship's board of directors on all major corporate decisions, including the establishment of Rosefielde's position, title, authority, and compensation. Judge Nugent also found that Rosefielde acted as the Lattugas' personal attorney and as the attorney for their company, JFL Ventures, when he acquired the Lattugas' 10 percent ownership interest in La Sammana in 2004.

We are bound to defer to the trial court's factual findings, as long as they are supported by adequate, substantial and credible evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974) (citation omitted). In a case in which the trial judge also sat as the trier of facts, we are precluded from disturbing the judge's factual findings and legal conclusions, " 'unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.' " *Seidman v. Clifton Savings Bank, S.L.A.,* 205 *N.J.* 150, 169, 14 *A.*3d 36 (2011) (quoting *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495).

We are also bound to defer to the trial judge's findings that are "substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (quoting *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). However, we do not owe any deference to the legal conclusions reached by the trial court, because our review of the law is de novo. *Borough of Harvey Cedars v. Karan,* 214 *N.J.* 384, 401–02, 70 *A.*3d 524 (2013) (citing

*Manalapan Realty v. Manalapan Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

We are satisfied that Judge Nugent's extensive recitation of his factual findings with respect to Rosefielde's role as general counsel and COO of Flagship and Atlantic Palace, as well as his role in drafting both the documents that created La Sammana Management and La Sammana's operating agreement, are supported by the competent evidence and are consistent with our own comprehensive review of the record described in sections II, III, and IV of this opinion.

## VIII

### *BREACH OF FIDUCIARY DUTY AND LEGAL MALPRACTICE*

Plaintiffs seek the equitable remedy of rescission of Rosefielde's ownership interests in La Sammana Management, La Sammana, and BA Management, based on his role in the formation of these entities and his subsequent conduct in their operation. Plaintiffs' theories of liability are grounded on legal malpractice and breach of fiduciary duty.

Defendants claim that Rosefielde did not act as an attorney when he drafted the documents that gave him an ownership interest in these entities, because he was not representing "a client" in any of these transactions. Defendants argue that the Supreme Court did not intend to apply the conflict of interest prohibitions in *RPC* 1.8 to lawyers who serve as a business entity's in-house counsel. Finally, defendants argue that plaintiffs' claims are barred by the equitable principles of estoppel and unclean hands as well as the legal concept of waiver. Judge Nugent rejected defendants' arguments. So do we.

As previously noted, the record supports Judge Nugent's findings that Kaye hired and considered Rosefielde to be both his personal attorney and COO and general counsel of Flagship and Atlantic Palace. Those findings are therefore binding

on this court. *Rova Farms, supra,* 65 *N.J.* at 484, 323 *A.*2d 495. It is immaterial that the lawyer and the client did not execute a specific retainer memorializing the attorney-client relationship. To form an attorney-client relationship, it is enough that the attorney has voluntarily agreed and acted as the client's legal advisor, and the client equally willingly sought and was guided by the attorney's counsel. As noted by the Court, "[r]epresentation is inherently a consensual relationship founded upon the lawyer affirmatively accepting a professional responsibility." *In re Silverman,* 113 *N.J.* 193, 207, 549 *A.*2d 1225 (1988). The acceptance of this relationship "need not necessarily be articulated, in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties." *In re Palmieri,* 76 *N.J.* 51, 58–59, 385 *A.*2d 856 (1978).

Defendants nevertheless argue that Judge Nugent erred in failing to appreciate that neither Kaye, Atlantic Palace, or Flagship were parties to the formation of La Sammana Management and that Rosefielde did not represent any of the other parties that formed La Sammana Management. According to defendants, even if Rosefielde had acted as an attorney for Kaye and Flagship on May 31, 2003, *RPC* 1.8 does not bar Rosefielde's interest in La Sammana Management, because he was not serving as an attorney for any of the parties involved.

We reject these arguments substantially for the reasons expressed by Judge Nugent. The record clearly establishes that the creation of La Sammana Management did not serve Kaye's business interests, only Rosefielde's unwarranted financial interests. As Judge Nugent explained:

Kaye made the decision to form the company against his own judgment and against that of his Chief Financial Officer who believed that the new company would unnecessarily increase the costs of [La Sammana]. *Kaye made the decision to form the company solely because Rosefielde, his attorney in whom he had placed his complete trust, recommended it.* Kaye therefore ignored his own independent judgment and kept his promise to unconditionally support Rosefielde's decisions.

To the extent that Rosefielde acquired an ownership interest in [La Sammana Management], that interest was adverse to the interest of Kaye, Kaye's children,

Kaye's trusts, and Kaye's businesses. Rosefielde was therefore required to comply with *RPC* 1.8(a).

[ (Emphasis added).]

Defendants nevertheless argue that the requirements of *RPC* 1.8 are not applicable to Rosefielde's actions in his capacity as general counsel. Defendants maintain that "the business judgment rule" is the more suitable and facially logical standard for assessing Rosefielde's conduct as a "corporate officer." *See Seidman v. Clifton Sav. Bank, S.L.A.*, 205 *N.J.* 150, 154, 14 *A.*3d 36 (2011). According to defendants, the Supreme Court intended that the ethical mandates set forth in *RPC* 1.8(a) would apply only in the traditional attorney-client relationship.

To illustrate the ostensible self-evident quality of their argument, defendants suggest that the following preposterous scenario would likely ensue if the requirements of *RPC* 1.8(a) were to be literally applied to an attorney serving as in-house counsel. Before accepting an employment offer from a corporate client, a putative in-house counsel,

would have to (1) insist that he [or she] be hired through a written agreement; (2) recommend in writing that the company seek advice of independent legal counsel; and (3) have the company give "informed consent" to the hiring in a signed writing. This process would repeat every time the attorney negotiated a monetary bonus or an equity interest.

Defendants' "straw man"[30] strategy is unavailing, because plaintiffs are not arguing that Rosefielde used his superior legal skills to negotiate a "sweetheart deal" for himself when he was

---

[30] Justice O'Hern succinctly described the "straw man" fallacy in his concurring opinion in *Canesi v. Wilson*, 158 *N.J.* 490, 730 *A.*2d 805 (1999):

In formal logic, the technique of setting up an argument that does not exist and then refuting that misrepresented argument is called the "straw man" fallacy. *See* Douglas Walton, *A Pragmatic Theory of Fallacy* 57 (1995). The straw man technique is fallacious because it leads to irrelevancies and because it precludes the development and resolution of the true issues of contention. *See* Madsen Pirie, *The Book of the Fallacy* 160 (1985).

[158 *N.J.* at 518, 730 *A.*2d 805 (quoting Philip M. Nichols, *Realism, Liberalism, Values, and the World Trade Organization*, 17 *U. Pa. J. Int'l Econ.* L. 851, 882 n. 20 (Fall 1996)).]

first hired as general counsel. The record shows that, throughout his tenure as general counsel, Rosefielde concocted a series of schemes designed to enrich himself at his clients' expense.

As avaricious and transparently duplicitous as Rosefielde's conduct was in forming La Sammana Management, Judge Nugent found that his acquisition of the Lattugas' 10 percent interest in La Sammana presented an even "[m]ore compelling" example of Rosefielde's unethical conduct and clear violation of his ethical obligations under *RPC* 1.8(a).

> When Rosefielde acquired Lattuga's 10% interest, [La Sammana] was owned by Kaye (70%), the Bruce Kaye Dynasty Trust (10%), JFL Ventures Inc., (10%), and Dennis Richard (10%). Rosefielde was General Counsel to [La Sammana], Lattuga's attorney, JFL Venture's attorney and Kaye's attorney. Rosefielde's acquisition of the Lattuga (JLF Venture) 10% interest was fraught with conflicts. Yet, Rosefielde did not comply with *RPC* 1.8(a) by advising Kaye and [La Sammana] of the desirability of seeking independent legal counsel, and by obtaining the written informed consent of Kaye and [La Sammana].

Independent of the particular facts of this case, we also discern no rational basis to exempt attorneys who have been hired by corporate clients to serve as in-house counsel from the ethical requirements of *RPC* 1.8. As we do in all cases that involve statutory or regulatory interpretation, we begin our analysis by trying to divine the intent of the drafter (in this case the Supreme Court) by giving the language under review its "ordinary, generally accepted meaning." *In re Plan for the Abolition of the Council on Affordable Housing,* 214 *N.J.* 444, 467, 70 *A.*3d 559 (2013) (citations omitted). If the language of *RPC* 1.8 is clear on its face, our task is complete. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005).

As an intermediate appellate court, we have no authority to substitute our judgment or views for terms of art that the Supreme Court explicitly chose to include or exclude when it drafted and approved *RPC* 1.8. Our Supreme Court has the plenary and exclusive authority to regulate the practice of law and the commensurate obligation to oversee the discipline of attorneys. *N.J. Const.* art. 6, § 2, ¶ 3; *R.* 1:20–1(a); *R.M. v. Supreme Court of N.J.,* 185 *N.J.* 208, 213–14, 883 *A.*2d 369 (2005). We are not at

liberty to rewrite a plainly written regulation promulgated by the Court.

With these principles in mind, we turn to the language in *RPC* 1.8(a):

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms in which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner that can be understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel of the client's choice concerning the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

We find nothing in the plain language used by the Court to suggest or even imply that lawyers who are retained by corporate clients as in-house or general counsel are exempt from the proscriptions of *RPC* 1.8(a). Indeed, the Court has recognized the unique role of an in-house counsel and addressed the limitations and responsibilities of that office in *Rule* 1:27–2. Of particular relevance here, the Court emphasized: "Except as specifically limited herein, *the rules, rights and privileges governing the practice of law in this State shall be applicable to a lawyer admitted under this Rule." R.* 1:27–2 (emphasis added). Nothing in the language employed by the Court exempts Rosefielde, in his capacity as in-house counsel, from the requirements of *RPC* 1:8(a).

Here, Rosefielde acted in a manner that was utterly inconsistent with the ethical responsibilities applicable to attorneys in this State. Although he was not admitted to the New Jersey Bar, he had the privilege of functioning in the limited capacity of in-house counsel, as that term is defined by the Court in *Rule* 1:27–2(a). He also had the concomitant responsibility to adhere to the requirements and limitations of *Rule* 1:27–2, which includes a commitment to comply with the ethical obligations of *RPC* 1.8(a). *Petit–Clair v. Nelson,* 344 *N.J.Super.* 538, 542, 782 *A.*2d 960 (App.Div.2001).

As we noted in the context of professionals involved in the delivery of health care, those who "engage in a highly regulated business which directly impacts upon the safety and welfare of the public, such as the delivery of health care," or in this case the practice of law, "are constructively on notice of the existence of legal requirements governing its practice and operations." *Open MRI of Morris & Essex, L.P. v. Frieri*, 405 *N.J.Super.* 576, 584, 966 *A.*2d 48 (App.Div.2009) (quoting *Material Damage Adj. Corp. v. Open MRI of Fairview*, 352 *N.J.Super.* 216, 227, 799 *A.*2d 731 (Law Div.2002)). Thus, "even a good faith belief that one is performing these services in a reasonable or otherwise sound manner is not a defense.... Sound public policy can accept no lesser standard." *Ibid.* (quoting *Material Damage Adj. Corp.*, *supra*, 352 *N.J.Super.* at 227, 799 *A.*2d 731).

Thirty-three years ago, the Supreme Court admonished attorneys in this State that violations of *RPC* 1.8(a) would not be tolerated. *In re Wolk*, 82 *N.J.* 326, 335, 413 *A.*2d 317 (1980). In the Court's own words: "This Court will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of trust funds." *Ibid.* (citing *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979)). The Court reiterated its commitment to deterring attorney misconduct associated with attorney-client business ventures seven years later. *In re Smyzer*, 108 *N.J.* 47, 57, 527 *A.*2d 857 (1987).

The Court's most recent comments on the subject, written by Justice Zazzali, echoed the Court's prior warning, declaring:

> In view of the trust placed in an attorney by his [or her] clients and the attorney's often superior expertise in complicated financial matters, a *lawyer must take every possible precaution in ensuring that his [or her] client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice.*
>
> [*In re Frost*, 171 *N.J.* 308, 328, 793 *A.*2d 699 (2002) (alteration in original) (quoting *In re Smyzer, supra*, 108 *N.J.* at 55, 527 *A.*2d 857).]

The record before us is clear that Rosefielde did not heed these admonitions and misused and violated the trust reposed in him by

plaintiffs in his capacity as their legal advisor and breached his fiduciary duty to act at all times in furtherance of their interests. Rosefielde committed these acts to enrich himself at plaintiffs' expense.

Judge Nugent also found that Rosefielde fraudulently acquired an ownership interest in BA Management by misrepresenting the formation document's content and legal significance to Kaye. The record supports the facts underlying Judge Nugent's decision. Judge Nugent accepted Kaye's testimony on this subject as credible. *Locurto, supra,* 157 *N.J.* at 471, 724 *A.*2d 234. Thus, the evidence shows that Rosefielde intentionally misrepresented the BA Management agreement as a document related to a trust Kaye wanted to establish for his children. Rosefielde produced only the signature page of the document, which Kaye signed without hesitation.

On these facts, Judge Nugent found that Rosefielde committed common law fraud by misrepresenting the document's content and legal significance, material facts that Rosefielde knew to be false, which Rosefielde intended Kaye to rely on and which Kaye reasonably relied on, proximately causing Kaye damages as a result. *See Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 610, 691 *A.*2d 350 (1997).

We therefore affirm Judge Nugent's decision as reflected in paragraph two of his November 1, 2007 order and judgment, to rescind Rosefielde's ownership interests granted by the La Sammana management agreement dated May 1, 2003, the Lattuga severance agreement dated July 11, 2004, and the BA Management agreement dated September 7, 2004. We also affirm the rescission of any income that defendants derived from these illicit transactions.

## IX

### *MALPRACTICE AND THE AWARD OF COUNSEL FEES*

To establish legal malpractice, a plaintiff must show: "(1) the existence of an attorney-client relationship creating a duty of

care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." *McGrogan v. Till*, 167 *N.J.* 414, 425, 771 *A.*2d 1187 (2001) (citing *Conklin v. Hannoch Weisman*, 145 *N.J.* 395, 416, 678 *A.*2d 1060 (1996)). The record here is replete with evidence supporting the first and second elements. There is no question that Rosefielde's conduct in his dealings with plaintiffs deviated from the standards of professional competence expected of an attorney in this State. We are less sanguine, however, about Judge Nugent's proximate cause analysis, especially as subsequently used by Judge Nugent to support the amount of counsel fees he awarded to plaintiffs.

A negligent attorney who commits malpractice "is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action." *Saffer v. Willoughby*, 143 *N.J.* 256, 272, 670 *A.*2d 527 (1996). The Court extended this principle in *Packard–Bamberger & Co. v. Collier*, 167 *N.J.* 427, 442, 771 *A.*2d 1194 (2001), to cases involving "an intentional violation of a fiduciary duty arising as a result of the attorney-client relationship." The defendant in *Packard–Bamberger* served as both corporate director and legal counsel to the corporation. 167 *N.J.* at 442, 771 *A.*2d 1194.

Similar to Rosefielde's dual role as COO and general counsel, the defendant in *Packard–Bamberger*, Amster, had both an ethical and professional duty as a lawyer and a fiduciary duty as a corporate officer. As the Court explained:

> Amster's duties as a director and legal counsel basically overlapped. Amster owed fiduciary duties to PB [the plaintiff] in both of his roles, and his misconduct breached his duties as a director and as an attorney. Because Amster violated the duty he owed to PB as legal counsel, the trial court's award of attorneys' fees was proper. In contrast, if Amster had not been counsel to PB, his fiduciary duty to PB would have arisen solely from his status as a director. He would not have rendered any legal services to the corporation and, therefore, attorneys' fees would not have been appropriate unless authorized by contract, statute, or some other specific rule.

[*Id.* at 443, 771 *A.*2d 1194.]

Here, Judge Nugent concluded that Rosefielde acted as general counsel, Kaye's personal attorney, and COO. Rosefielde

committed malpractice by violating *RPC* 1.8(a) and by fraudulently obtaining his interest in BA Management. In Judge Nugent's words: "*RPC* 1.8 exists to guard against precisely the harm occasioned by Rosefielde's conduct and self-dealing with his clients." Judge Nugent found plaintiffs' legal malpractice expert's testimony credible and persuasive on the question of whether Rosefielde committed malpractice. He concluded that Rosefielde's fraudulent conduct creating BA Management and obtaining an interest therein constituted malpractice per se. On these bases, Judge Nugent found that plaintiffs were entitled to compensatory damages that included counsel fees and the cost for prosecuting the malpractice action.

Defendants argue that Judge Nugent misapplied the Court's holding in *Packard–Bamberger*, because an award of attorneys' fees is only appropriate in a case establishing intentional misconduct on the part of an attorney. Although we do not agree with defendants' narrow construction of the Court's holding in *Packard–Bamberger*, there is sufficient evidence in the record to support intentional misconduct by Rosefielde.

As Judge Nugent correctly found, Rosefielde's interest in La Sammana Management was larger than Kaye had authorized and was larger than the interest of the trust that Kaye had created. However, Kaye was unaware of the extent of the combined compensation and ownership interest that Rosefielde gave himself when he drafted these documents. Furthermore, despite defendants' assertion that Rosefielde did not engage in intentional misconduct in acquiring his interest in La Sammana because Wolfe, Valenti, and Kaye all knew and supported the idea, the evidence supports Judge Nugent's finding that Kaye did not propose or even know of Rosefielde's acquisition of Lattuga's interest.

With respect to BA Management, defendants contend that the undisputed facts established that Kaye had complete control of that entity, that it had no assets or value, that other entities controlled by Kaye declined to enter into any agreements with it,

and that the entity was dissolved shortly after Rosefielde was terminated. These facts, however, do not refute Kaye's testimony that Rosefielde never disclosed the existence of BA Management to him and that he only found out about its existence after Rosefielde's separation in January 2005. In our view, Rosefielde set up this entity to create the potential of future income to himself. Judge Nugent correctly held that Rosefielde breached his duty to plaintiffs when he established BA Management.

Our concern with the trial court's ruling stems from the amount of counsel fees awarded to plaintiffs and its relationship to actual damages proximately caused by Rosefielde's malpractice. As actual compensatory damages, Judge Nugent found that plaintiffs were entitled to receive the $4000 incurred in connection with Rosefielde's trip to Las Vegas. Although he also ordered the rescission of Rosefielde's ownership interests in the three closely-held corporations, he did not articulate a reliable method for assessing the market value of these shares. Judge Nugent did not find any other actual damages resulting from Rosefielde's actions, including the claims of attorney malpractice, fraud, or breach of fiduciary duty.

Despite this, Judge Nugent awarded plaintiffs $803,189.99 in counsel fees. He explained his reasoning in a detailed twenty-two-page memorandum. According to Judge Nugent, plaintiffs were entitled to recover 75 percent of their fees of $1,030,297.84. He found that plaintiffs successfully prosecuted the Lattuga release, the La Sammana Management agreement, and the BA Management agreement. Judge Nugent found that plaintiffs were only partially successful in prosecuting the legal malpractice and fraud in reimbursements, breach of fiduciary duty, fraud, and unfaithful servant.[31] The ultimate award of $803,189.99 reflected 75 percent of costs, with a slight reduction of the fees charged by the legal malpractice expert in his analysis of plaintiffs' claims under the "Do Not Call" law. Finally, Judge Nugent awarded

---

[31] Plaintiffs withdrew their unauthorized practice of law claim.

defendants 10 percent of their counsel's fees and costs based on indemnification for count four of the second amended complaint (legal malpractice involving the FTC investigation and fines), totaling $86,514.23. Thus, he awarded plaintiffs a net total of $716,675.76 for fees and costs.

Defendants argue that Judge Nugent erred by allocating 70 percent of the fees to claims where no relief was granted and that it was unfair to award less than 20 percent for Rosefielde's counterclaims. Defendants maintain that no more than 10 percent of the fees were related to the three rescinded transactions.

■■■ In all fee applications, a court must carefully and critically evaluate the lodestar, which is the fee based on " 'aggregate hours and specific hourly rates' " submitted by counsel for the prevailing party and it should not " 'accept passively' " counsel's submissions. *Walker v. Giuffre*, 209 *N.J.* 124, 131, 35 *A.*3d 1177 (2012) (quoting *Rendine v. Pantzer*, 141 *N.J.* 292, 335, 661 *A.*2d 1202 (1995)). A reasonable hourly rate is calculated "according to the prevailing market rates in the relevant community." *Id.* at 132, 35 *A.*3d 1177 (citations omitted); *accord R.M. v. Supreme Court of N.J.*, 190 *N.J.* 1, 9–10, 918 *A.*2d 7 (2007). The trial court should then reduce the lodestar if the plaintiff achieved only partial success when compared with the relief sought. *Packard–Bamberger, supra,* 167 *N.J.* at 446, 771 *A.*2d 1194. However, the ultimate fee award need not be proportionate to the amount of damages recovered by the plaintiff. *Rendine, supra,* 141 *N.J.* at 336, 661 *A.*2d 1202.

■■■ Parties will be considered prevailing " 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.' " *R.M., supra,* 190 *N.J.* at 9–10, 918 *A.*2d 7 (quoting *Hensley v. Eckerhart,* 461 *U.S.* 424, 433, 103 *S.Ct.* 1933, 1939, 76 *L.Ed.*2d 40, 50 (1983)). Further, the Court has rejected the application of " 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon' because '[s]uch a ratio provides little aid in determining what is a reasonable fee in light of all the relevant

factors.' " *New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr.*, 185 *N.J.* 137, 154, 883 *A.*2d 329 (2005) (alteration in original) (quoting *Silva v. Autos of Amboy, Inc.*, 267 *N.J.Super.* 546, 555–56, 632 *A.*2d 291 (App.Div.1993)).

Judge Nugent correctly determined that plaintiffs prevailed in a significant number of areas. However, plaintiffs were only able to show limited damages. Although the rescission of Rosefielde's share of three entities and the award of $4000 is not nominal, we conclude that Judge Nugent's 75 percent analysis is not supported by the quantifiable damage award and constitutes a mistaken exercise of discretion. Although Judge Nugent correctly found that plaintiffs successfully established their breach of fiduciary claim, he did not award compensatory or disgorgement damages based on that theory of liability.

Judge Nugent found that plaintiffs did not sustain quantifiable compensatory damages on their claims based on civil fraud and unfaithful servant. Plaintiffs' methodology for establishing the value of Rosefielde's share of the three entities was based on speculation as to future sales. There was no indication of their worth at the time Rosefielde parted with Kaye and left his positions as COO and general counsel. Plaintiffs did not show that they were damaged by the creation of BA Management, because it never functioned as an entity.

We thus remand for the trial court to recalculate the amount of counsel fees plaintiffs are entitled to receive guided by the principles outlined herein.

## X

### PUNITIVE DAMAGES

Defendants argue that the punitive damages award was unwarranted. They assert: (1) a court of equity may not award punitive damages; (2) there is no factual support in the record for punitive damages; (3) Judge Nugent violated the Punitive Damages Act by failing to bifurcate the proceedings and by prejudging the issue;

and (4) attorneys' fees do not constitute "compensatory damages" under the Punitive Damages Act. We reject defendants' arguments as reflected in their argument points (1), (3), and (4). As to point (2), we remand for the trial court to reconsider the issue based on our discussion and holding in Section IX concerning compensatory damages.

## A

### PUNITIVE DAMAGES IN GENERAL EQUITY

Defendants argue that the equitable relief available in the General Equity Part cannot sustain an award of punitive damages, because it lacks the indispensable prerequisite of compensatory damages. They also argue that the only purely compensatory damages awarded by the trial court was insufficient to warrant the imposition of extraordinary punitive measures. Judge Nugent disagreed:

> The defendants argue that the plaintiffs are not entitled to punitive damages because their remedy with respect to Rosefielde's fraudulent acquisition of his interest in BA Management was equitable, and did not constitute compensatory damages. The defendants also argue that the four thousand dollars Rosefielde fraudulently obtained as business expenses was *de minimus*. *However, the defendants fail to consider the award of counsel fees against Rosefielde for his legal malpractice and intentional misconduct in fraudulently obtaining the interest in BA Management.*

[ (Emphasis added).]

Judge Nugent thus did not directly address defendants' argument because, in his view, the record supported the imposition of punitive damages using the traditional platform of compensatory damages.

█ Relying on *Fleischer, supra,* defendants claim the Court held punitive damages may not be awarded by a court of equity. Defendants reliance on *Fleischer* is both misplaced and misstated. Writing for the Court, Justice Heher actually stated: "[D]amages awarded in equity are *ordinarily* compensatory and not punitive." 1 *N.J.* at 151, 62 *A.*2d 383 (emphasis added).

 In our modern practice of law, it is not uncommon for parties to seek a combination of both equitable and legal relief. As our discussion of the doctrine of ancillary jurisdiction in Section VI of this opinion shows, the Chancery Division has jurisdiction over legal issues to the extent that they are "incidental or essential to the determination of some equitable question." *Lyn–Anna, supra,* 145 *N.J.* at 330, 678 *A.*2d 683. This case amply demonstrates the application of the exercise of this power by the Chancery Division.

 The authority of the trial court to award punitive damages is carefully circumscribed by the Punitive Damages Act (PDA), *N.J.S.A.* 2A:15–5.9 to –5.17. It is a long-settled maxim of statutory construction that, in drafting and adopting a law, the Legislature uses words carefully and with complete awareness of their legal import. As our colleague Judge Sabatino noted in *In re State Board of Education,* 422 *N.J.Super.* 521, 536, 29 *A.*3d 1079 (App.Div.2011), "[i]n construing a statute, we strive to give meaning to every provision and every word contained within that statute." Here, in adopting the PDA, the Legislature provided as follows:

b. In determining whether punitive damages are to be awarded, *the trier of fact* shall consider all relevant evidence, including but not limited to, the following:

(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

c. If *the trier of fact* determines that punitive damages should be awarded, the trier of fact shall then determine the amount of those damages. In making that determination, the *trier of fact* shall consider all relevant evidence, including, but not limited to, the following:

(1) All relevant evidence relating to the factors set forth in subsection b. of this section;

(2) The profitability of the misconduct to the defendant;

(3) When the misconduct was terminated; and

(4) The financial condition of the defendant.

[*N.J.S.A.* 2A:15–5.12 (emphasis added).]

By intentionally using the term "trier of fact" as opposed to "jury," the Legislature unmistakably acknowledged the power of judges to award punitive damages when they sit as the trier of fact, as Judge Nugent did here. Indeed, the Supreme Court unequivocally recognized the Chancery Division's authority to award punitive damages in probate matters, provided the award of punitive damages is warranted by the facts and the probate court adheres to the provisions of the PDA. *In re Estate of Stockdale,* 196 *N.J.* 275, 308, 953 *A.*2d 454 (2008); *In re Niles,* 176 *N.J.* 282, 300, 823 *A.*2d 1 (2003).

We turn next to defendants' second argument point, the lack of a factual basis to impose punitive damages. Under the PDA, plaintiffs must prove, "by clear and convincing evidence," that,

> *the harm suffered* was the result of the *defendant's acts or omissions,* and such acts or omissions were actuated by *actual malice or* accompanied by *a wanton and willful disregard* of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
>
> [*N.J.S.A.* 2A:15–5.12(a) (emphasis added).]

*N.J.S.A.* 2A:15–5.10 defines "actual malice" as "an intentional wrongdoing in the sense of an evil-minded act" and "wanton and willful disregard" as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." *N.J.S.A.* 2A:15–5.12(b)(1) requires plaintiffs to show "[t]he likelihood, at the relevant time, that serious harm would arise from the defendant's conduct."

Judge Nugent concluded that Rosefielde fraudulently acquired his interest in BA Management and intended to defraud Kaye and others out of $1,000,000 over five years. He found that Rosefielde's actions in acquiring the interest "were actuated by actual malice and were accompanied by a wanton and willful disregard of the interests of Bruce Kaye and others who would have been defrauded had Rosefielde's misconduct not been discovered." Giv-

en the trust Kaye placed in Rosefielde and the unchecked control over the entities at the time Rosefielde fraudulently acquired his interest in BA Management, Judge Nugent concluded that there was a substantial likelihood that Rosefielde's scheme would have succeeded.

The record supports that Rosefielde did not disclose the existence of BA Management to Kaye and that Kaye discovered its existence only after Rosefielde had separated from his employment. However, although Rosefielde set up this entity with the potential of wrongfully diverting future income to himself, to Kaye's clear detriment, there is no evidence that Kaye suffered actual damages. Any potential economic injury to Kaye was cured by the remedy of rescission. Rosefielde's valuation of his potential interest in BA Management at $1,000,000 was based on speculative estimates of future income. Punitive damages for actions constituting attorney malpractice, fraud, or breach of fiduciary duty require a showing that plaintiffs were actually damaged by Rosefielde's actions. The record here does not support such a finding.[32]

The $4000 award in connection with the Las Vegas trip is unquestionably a form of compensatory damages. "The goal of compensatory damages is to restore the plaintiff to the same position it was in prior to the occurrence of the wrong. This is true whether the wrong inflicted lies in contract or tort." *Material Damage Adj. Corp.*, *supra*, 352 *N.J.Super.* at 232, 799 *A.*2d 731. Furthermore, Judge Nugent found, and the record shows, that Rosefielde was well aware of the fact that his presence in Las Vegas was not business-related. He nevertheless submitted a voucher and obtained the reimbursement of his personal expenses, knowing that no one would dare to question him.

---

[32] Although disgorgement of Rosefielde's substantial $500,000 annual salary or "consulting fee" may have formed the basis for punitive damages, Judge Nugent, in our view, correctly denied this form of relief to plaintiffs.

Judge Nugent concluded that Rosefielde "engaged in that conduct with a willful and wanton disregard of his corporate fiduciary obligations and the harm, albeit relatively minor, that would occur to the corporation." Judge Nugent also emphasized that, even after Rosefielde was confronted at trial with these proofs, he steadfastly defended his untenable position. Defendants' argument attacking Judge Nugent's alleged failure to bifurcate the proceedings lacks sufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E).

■ Equally meritless is defendants' argument that counsel fees are not "compensatory damages" in a legal malpractice action. As Judge Nugent noted:

The Punitive Damages Act defines compensatory damages as "damages intended to make good the loss of an injured party, and no more." *N.J.S.A.* 2A:15–5.10. The term includes general and special damages and does not include nominal, exemplary or punitive damages. *Ibid.* The award of counsel fees in a legal malpractice action constitutes compensatory damages. *See Saffer v. Willoughby,* 143 *N.J.* 256, 272 [670 *A.*2d 527] (1996) (holding that a successful claimant in a legal malpractice action is entitled to reasonable expenses and attorneys' fees as consequential damages.); *Grubbs v. Knoll,* 376 *N.J.Super.* 420, 431 [870 *A.*2d 713] (App.Div.2005) (explaining that award of fees in connection with a fee application in a legal malpractice action consequential [sic] compensatory damages). Moreover, the Punitive Damages Act makes no reference to a *de minimus* claim. Rather, the Act requires that compensatory damages be more than nominal damages, and defines nominal damages as "damages that are not designed to compensate a plaintiff and are less than $500." *N.J.S.A.* 2A:15–5.10. The attorneys' fees allocated to the plaintiffs' claim for rescission concerning BA Management clearly exceeded $500.00.

We are in complete agreement with Judge Nugent on this point. Thus on remand, the trial court must reexamine whether punitive damages are warranted under the PDA, and if so, how much they should be. In performing this analysis, the court may consider an award of counsel fees based on legal malpractice as compensatory damages. *N.J.S.A.* 2A:15–5.10 However, the court must identify with particularity the conduct that warrants punitive damages using the standard established by the Legislature in *N.J.S.A.* 2A:15–5.12(b) and (c). Thereafter, any award of punitive damages must fall within the cap established by the Legislature in *N.J.S.A.* 2A:15–5.14(b).

## XI

### ROSEFIELDE'S CEPA CLAIMS

On the question of Rosefielde's CEPA claims, relying on *Feldman v. Hunterdon Radiological Associates*, 187 *N.J.* 228, 901 *A.*2d 322 (2006), Judge Nugent concluded that Rosefielde did not qualify for employee status under CEPA. Defendants note that almost two weeks after Judge Nugent's ruling, the Supreme Court decided *D'Annunzio v. Prudential Insurance Co. of America*, 192 *N.J.* 110, 927 *A.*2d 113 (2007), and *Stomel v. City of Camden*, 192 *N.J.* 137, 927 *A.*2d 129 (2007), which defendants claim provide a solid factual and legal basis for Rosefielde's CEPA claim. We disagree.

Judge Nugent conducted a complete and thorough analysis using the *Feldman* standard:

> Rosefielde does not meet the [*Feldman*] test for an employee. Rosefielde's work was virtually unsupervised. Although Rosefielde reported to Kaye, Rosefielde had Kaye's unqualified support. Kaye backed Rosefielde even when he disagreed with Rosefielde's decision, as illustrated by the creation of La Sammana Management. Rosefielde was capable of influencing virtually every aspect of the operation of Flagship, Atlantic Palace, and other related companies as well. Neither Kaye nor Rosefielde intended that Rosefielde be treated as an employee. Instead, Rosefielde was treated as a consultant retained through Rosefielde's Florida Corporation. Rosefielde simply does not qualify as an "employee" within the meaning of the Conscientious Employee Protection Act.

In *D'Annunzio v. Prudential Insurance Company of America*, *supra*, 192 *N.J.* at 123, 927 *A.*2d 113 (quoting *Pukowsky v. Caruso*, 312 *N.J.Super.* 171, 182–83, 711 *A.*2d 398 (App.Div.1998)), the Court held that to resolve a summary judgment motion in a CEPA case based on whether an individual qualifies as an employee, the trial court must consider the following factors:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.

In *Stomel, supra,* 192 *N.J.* at 154–56, 927 *A.*2d 129, the Court considered the same twelve factors and held that a public defender who had his own office and worked under annual contracts was nevertheless engaged to fulfill the municipality's public defender function required by the Municipal Public Defender's Act, *N.J.S.A.* 2B:24–1 to –17, and therefore could be considered an employee under CEPA.

Both *D'Annunzio* and *Stomel* do not alter the test set forth in *Feldman.* Instead, they set forth additional factors for a judge to consider. Although Judge Nugent did not specifically consider the list of twelve factors listed in these cases, we are satisfied, as a matter of law, that applying these factors would not result in an outcome different than the one articulated by Judge Nugent.

Kaye did not control the means and manner of Rosefielde's performance. By contrast, he gave him complete control over his businesses and did not supervise him in any way. While Rosefielde worked at Flagship and Atlantic Palace, he was not paid wages. The money was paid as a consulting fee to an entity owned and controlled by Rosefielde. As construed by the Supreme Court in both *D'Annunzio* and *Stomel,* Rosefielde is not covered by the protections afforded to employees under CEPA.

## XII

## *CROSS–APPEAL*

We affirm Judge Nugent's rulings and judgments on the issues raised by plaintiffs in their cross-appeal, substantially for the reasons expressed by Judge Nugent in his memorandum of opinion dated August 10, 2007.

## XIII

## *CONCLUSION*

On defendants' direct appeal, we affirm the final judgment of the trial court to rescind Rosefielde's ownership interests in La

Sammana, La Sammana Management and BA Management. We affirm the trial court's judgment finding that Rosefielde committed legal malpractice and civil fraud, both in his capacity as in-house general counsel of Kaye's business entities and in his role as Kaye's personal attorney.

We vacate the trial court's award of counsel fees to plaintiffs and remand for the trial court to reconsider and, if necessary, recalculate the amount of counsel fees, if any, that plaintiffs are entitled to receive consistent with this opinion. We also vacate the trial court's award of punitive damages and remand for the trial court to reconsider whether an award of punitive damages is sustainable consistent with this opinion.

On plaintiffs' cross-appeal, we affirm the judgment of the trial court.